# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SONYA HOOKER, SYBIL
RUMMAGE, DONNA DEAL,
KENNETH MICHAEL DEAL and
BETTY DEAL, individually and
on behalf of a class of those
similarly situated,

      **Plaintiffs,**

v.

THE CITADEL SALISBURY LLC,
SALISBURY TWO NC PROPCO,
LLC, ACCORDIUS HEALTH LLC,
THE PORTOPICCOLO GROUP, LLC,
SIMCHA HYMAN and NAFTALI
ZANZIPER,

      **Defendants.**

**COMPLAINT – CLASS ACTION**

By and through undersigned counsel, Plaintiffs bring this action and allege:

## I.  INTRODUCTION.

1.  This case involves severe systematic understaffing at the Citadel nursing home in Salisbury, NC. The understaffing is proven by hours data reported to the Centers for Medicare and Medicaid Services ("CMS") by the facility's owners and required to be accurate, by testimony of the Plaintiffs and of staff, and by state investigator survey results.

2.  The Plaintiffs paid the facility for services that were to include adequate staffing or assigned their Medicare and Medicaid benefits to the facility in return for the promise of those services. As a result of Defendants' understaffing, the Plaintiffs did not receive the services for which they contracted. They are entitled to damages reflecting

1

private payments they made, out-of-pocket expenses they incurred, and/or reflecting the reasonable value of the staffing hours they were entitled to have received and did not receive. The Court may certify a class on the common issue of the facility's systematic understaffing in this regard as other courts have done in similar cases.[1]

3. The Plaintiffs do not at this time bring any claims herein for which certification of a medical malpractice standard of care violation causing personal injury or death is required under N.C.G.S. § 1A-1, Rule 9(j).[2] Rather, this case is about corporate failure to budget for required staffing. In the words of one of Sara Dieter of Accordius Health, when asked about the wage scales used for paying staff, "[t]hat is business. That is not Citadel Salisbury. That is business."[3]

4. Plaintiffs further assert that Defendants were obligated when they assumed control over the facility on February 1, 2020 to provide written resident agreements describing their terms of service for the Plaintiffs to review, and if acceptable, for the Plaintiffs to agree to, and to provide written disclosures of Plaintiffs' rights as required by state statute. Defendants did not do so. This failure to obey a consumer disclosure statute was an unfair and deceptive trade practice. Defendants also concealed and failed to disclose the actual facts regarding their services and supplies they would provide.

---

[1] See motion for class certification and supporting brief, filed herewith, citing cases.
[2] *Rudisill v. United States*, No. 5:13-CV-110-F, 2014 U.S. Dist. LEXIS 36795, *14-15, 2014 WL 1117976 (E.D.N.C. Mar. 20, 2014) (unpub.) (Rule 9(j) is substantive law). By bringing this action, Plaintiffs do not waive, and reserve the right to in the future bring, any claims not brought herein,
[3] Sara Dieter 3/11/21 depo. p. 152.

Accordingly, Plaintiffs have additionally brought a Chapter 75 claim under N.C.G.S. § 1-75.1 *et seq.* ("NC UDAP").

5. Plaintiffs have alleged putative class action claims for breach of contract (Count One) and NC UDAP (Count Two). In addition, Plaintiffs have brought individual claims for breach of fiduciary duty (Count Three), for negligent infliction of severe emotional distress (Count Four), and a claim alleging the direct involvement and culpability of the non-Citadel Defendants (Count Five).

## II. PARTIES.

### A. Plaintiffs.

6. Plaintiff **Sonya Hooker** is a citizen and resident of Rowan County, North Carolina. She is the adult daughter of Plaintiff Sybil Rummage and sponsors and assists Ms. Rummage who is a resident at The Citadel Salisbury nursing home located at 710 Julian Road, Salisbury, Rowan County, North Carolina (the "Facility").

7. Plaintiff **Sybil Rummage** is a citizen of the State of North Carolina who is a resident at the Facility. She has been a resident since on or about September 19, 2015.

8. Plaintiff **Donna Deal** is a citizen of the State of North Carolina who resides in China Grove, Rowan County, North Carolina, and along with her husband sponsors and assists of Plaintiff Betty Deal who is a resident at the Facility.

9. Plaintiff **Kenneth Michael "Mike" Deal** is a citizen of the State of North Carolina who resides in China Grove and is a family sponsor with his wife Donna of Plaintiff Betty Deal who is a resident at the Facility.

3

10.     Plaintiff **Betty Deal** is a citizen of the State of North Carolina and is a resident of the Facility.  She has been a resident since on or about April 8, 2019.

**B.     Defendants.**

11.     Defendant **The Citadel Salisbury LLC**, d/b/a The Citadel at Salisbury, The Citadel Salisbury, Citadel-Salisbury, and/or the Citadel ("The Citadel"), is a limited liability company organized under North Carolina law, with a principal place of business at 710 Julian Road, Salisbury, NC 28147.  It may be served with process at the 710 Julian Road address; at c/o registered agent, Corporate Creations Network, Inc., 15720 Brixham Hill Avenue #300, Charlotte, NC 28277; or at 440 Sylvan Ave., Suite 240, Englewood Cliffs, NJ 07632.

12.     The Citadel holds a license with the State of North Carolina, Department of Health and Human Services, Division of Health Services Regulation ("NC DHSR") to operate as a for-profit combination Skilled Nursing Facility ("SNF") and Adult Care Home ("ACH"). The facility has a total of 160 SNF beds and 20 ACH beds.  It holds North Carolina license number NH0441, NPI number 1144868092, and provider number #345115.  The sole members and owners of The Citadel as an LLC are Defendants Simcha Hyman and Naftali Zanziper, individuals who reside in New Jersey.

13.     Defendant **Salisbury Two NC Propco LLC** is a limited liability company organized under North Carolina law, with a principal place of business at 710 Julian Road, Salisbury, NC 28147.  It may be served with process at the Julian Road address; at c/o Corporate Creations Network, Inc., 15720 Brixham Hill Avenue #300, Charlotte, NC 28277; or at 440 Sylvan Ave., Suite 240, Englewood Cliffs, NJ 07632.  Salisbury Two NC

4

Propco LLC owns the property where the Facility is operated. The sole members and owners of Salisbury Two NC Propco LLC are Simcha Hyman and Naftali Zanziper.

14.     Defendant **Accordius Health LLC** ("Accordius") is a limited liability company organized under the laws of the State of New York, with its principal office located at 440 Sylvan Avenue, Suite 240, Englewood Cliffs, NJ 07632. It may be served with process at c/o Corporate Creations Network, Inc., 15720 Brixham Hill Avenue #300, Charlotte, NC 28277, or, at its office address at Sylvan Ave. The sole members of Accordius are Simcha Hyman and Naftali Zanziper.

15.     Accordius has stated that it provides "management" services[4] to the Facility. During the pertinent times, Accordius was directly and materially involved in making and implementing the staffing and supply decisions that gave rise to this action. Accordius employed nonparty facility administrator Sherri Stoltzfus.

16.     Defendant **The Portopiccolo Group LLC** ("Portopiccolo") is a limited liability company organized under New Jersey law. It may be served with process at 440 Sylvan Ave., Suite 240, Englewood Cliffs, NJ 07632; or at 200 Boulevard of the Americas, Suite 105, Lakewood NJ 08701. The sole members of Portopiccolo are Simcha Hyman and Naftali Zanziper.

---

[4] *See Accordius Health, LLC v. Marshall*, No. 1:20-cv-00464-TDS-JLW (M.D.N.C.), Affidavit of Simcha Hyman filed at Doc. 28-3, ¶ 6 (averring that Accordius "provides management and consulting services to The Citadel Salisbury").

17.     Portopiccolo states that it provides "back-office services" to the Facility.[5]  In fact, Portopiccolo does far more.   Portopiccolo and Defendants Hyman and Zanziper exclusively control key aspects of Facility operations including a) negotiating, making and breaking vendor contracts, b) setting wage and pay scales for workers, c) hiring contract labor, d) budgeting, e) accounting for revenues, expenses, profits and losses, f) dealing with the relevant lenders, including nonparty Oxford Finance LLC, and g) preparing and instructing facilities in Portopiccolo's nursing home chain as to contracts, forms, policies and procedures to use or not to use.  Portopiccolo was directly and materially involved in making and implementing the staffing and supply decisions that gave rise to this action.

18.     Defendant **Simcha Hyman** is an individual who on information and belief maintains a permanent place of residence in New Jersey.  He may be served with process at 65 Wesley Chapel Road, Suffern NY 10901; at c/o The Portopiccolo Group LLC, 440 Sylvan Ave., Suite 240, Englewood Cliffs, NJ 07632, or, c/o Accordius Health LLC, 15720 Brixham Hill Avenue #300, Charlotte, NC 28277.  He is the Chief Executive Officer of Portopiccolo and CEO and Manager of Accordius.  He co-owns each LLC Defendant.

19.     Defendant **Naftali Zanziper** is an individual who on information and belief maintains a permanent place of residence in New York.  He may be served with process at 149 Highland Ave, Unit 20, Woodridge NY 12789-5716; 1848 East 33rd Street, Brooklyn NY 11234; c/o The Portopiccolo Group LLC, 440 Sylvan Ave., Suite 240, Englewood

---

[5] *See Accordius Health, LLC*, No. 1:20-cv-00464-TDS-JLW (M.D.N.C.), Affidavit of Simcha Hyman filed at Doc. 28-3, ¶ 7 (averring that Portopiccolo "provides certain back-office services to The Citadel Salisbury, LLC").

Cliffs, NJ 07632, or, c/o Accordius Health LLC, 15720 Brixham Hill Avenue #300, Charlotte, NC 28277. He is President of Portopiccolo and Manager of The Citadel Salisbury LLC. He co-owns each LLC Defendant.

20. Mr. Hyman and Mr. Zanziper are the 50/50 co-owners of and the two members in every relevant LLC herein: The Portopiccolo Group, LLC, Accordius Health, LLC, The Citadel Salisbury, LLC, Salisbury Two NC Propco, LLC, as well as of other entities including a purported contract labor agency, nonparty Daisy Staffing, LLC.

21. Mr. Hyman and Mr. Zanziper employ a business model in which their staff and local managers do not know the facts or have any authority regarding the budgeting and balance sheets of the enterprise. Ordinarily, managers such as the administrator (Sherri Stoltzfus), Controller (Alexandria Russell), nursing executive (Sara Dieter), or Chief Operating Officer (Kim Morrow) would know these facts and have input. Here, they have none, as they have admitted in prior depositions. Only Mr. Hyman and Mr. Zanziper have this knowledge and this control within this enterprise and due to their direct personal involvement, they are jointly and severally individually liable for the damage that their business model herein has caused.[6]

---

[6] From *Marshall v. Accordius, supra, see* Sara Dieter depo. 3/11/21 p. 44 ("Accordius does not operate in the traditional sense financially"), 72-73 ("There's no budget delivered to the administrator."), 99 (not aware of contract terms with vendors); Alexandria Russell depo. 3/4/21 pp. 33 (fines are dealt with by accounts payable, by someone named Naftoli Sachs), 81 (Sachs is with Portopiccolo), 92 (she is not aware of who owns Daisy Staffing), 94 (she is the controller but does not know what is billed for any of the residents), 136 (stating that there is no budget for the Citadel Salisbury nor for any facility, that she is aware of, though she is the controller; not aware of whether there are assets available to improve the facility), 137 (does not know bonus structure).

III.    **JURISDICTION AND VENUE.**

22.    This Court has jurisdiction over the parties as the parties have all had substantial contacts with the State of North Carolina and otherwise meet the criteria for personal jurisdiction.

23.    The Court has jurisdiction over the subject matter, under diversity of citizenship in light of the fact that the Plaintiffs are citizens of a different state that any of the Defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a)(1).

24.    In addition, the case is subject to federal court jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), in that the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant.

25.    Venue is proper in this Court.  28 U.S.C. § 1391.

IV.    **BACKGROUND FACTS.**

    A.    **Facts regarding the Citadel Salisbury.**

26.    The Facility is a combination skilled SNF and ACH located at 710 Julian Road, Salisbury, NC 28147.  It is licensed by the NC DHSR, with the current license holder being The Citadel.  Under North Carolina's certificate of need regulatory regime, a new operator is allowed to be grandfathered in under an old operator's license.  While the Facility has been participating in the Medicare and Medicaid programs since 1988 under a series of owners, The Citadel only became the current owner on February 1, 2020.

8

27.     Portopiccolo has described itself as a "private equity"[7] company which acquires "distressed assets."[8] The owners, Hyman and Zanziper, previously ran a business that sold cut-rate medical supplies, known as Ultra Care Medical Supply.  After selling that business off to private equity, they decided to bring their cost-cutting model over to the nursing home business.  However, nursing homes bring with them extra responsibilities as they involve people, not products.

28.     Portopiccolo was organized as a New Jersey limited liability company on or about January 1, 2018.  Portopiccolo controls a chain of nursing homes that has grown from none in 2016 to over 120 today.  It has grown its enterprise by using reckless cost-cutting measures that have led to it owning facilities predominantly ranked as only one- or two-star by the official U.S. Government CMS Nursing Home Compare regulatory apparatus and its five-star rating system.  Moreover, Portopiccolo is heavily leveraged and

---

[7] Oxford Finance, Oxford Finance Provides $64.6 Million Credit Facility to The Portopiccolo Group, press release dated Feb. 6, 2020 (describing that "The Portopiccolo Group is a family owned private equity and investment management firm" that has "an ever-growing portfolio of properties leased to skilled nursing operators"). Available at https://oxfordfinance.com/news/oxford-finance-provides-64-6-million-credit-facility-to-the-portopiccolo-group/.

[8] *See* Rebecca Tan and Rachel Chason, An Investment Firm Snapped Up Nursing Homes During the Pandemic, The Washington Post, Dec. 21, 2020 ("For years, Hyman and Zanziper described Portopiccolo as a private equity firm. But that description, along with the group's promise to swiftly turn 'distressed assets' profitable, was removed from the Portopiccolo website in early December after inquiries from The Washington Post about the firm's nursing home acquisitions.").  Available at https://www.washingtonpost.com/local/portopiccolo-nursing-homes-maryland/2020/12/21/a1ffb2a6-292b-11eb-9b14-ad872157ebc9_story.html (Tan and Chason 2020).

indebted to private equity lenders and either refuses to, or lacks the ability of its own accord to, increase staffing and supplies to necessary levels.

29.    In recent years, the universe of nursing homes has changed.  In the past, nursing homes were often run by local charities and nonprofits.  However, the industry has been overtaken by for-profit operators, with the result being that today, 70% or more of all nursing homes are operated by for-profit chains.

30.    The for-profit business model has led to worsening of staffing metrics and of quality of resident care as documented by peer-reviewed research.[9]  Facilities have had care deteriorate as private equity owners sought to extract profits and high-interest lenders demanded repayment.[10]  However, by use of grandfathering provisions and other loopholes in state regulations, these for-profit, low-quality chains have burgeoned.

---

[9] See publications cited in expert report of Charlene Harrington, filed herewith.

[10] E.g., Nancy Ochieng, Priya Chidambaram, Rachel Garfield, and Tricia Neuman, Factors Associated With COVID-19 Cases and Deaths in Long-Term Care Facilities: Findings from a Literature Review, Kaiser Family Foundation Issue Brief, Jan 14, 2021, at https://www.kff.org/coronavirus-covid-19/issue-brief/factors-associated-with-covid-19-cases-and-deaths-in-long-term-care-facilities-findings-from-a-literature-review/; Cristina Boccuti, Giselle Casillas, Tricia Neuman, Reading the Stars: Nursing Home Quality Star Ratings, Nationally and by State, , Kaiser Family Foundation Issue Brief, May 2015, at https://files.kff.org/attachment/issue-brief-reading-the-stars-nursing-home-quality-star-ratings-nationally-and-by-state; Atul Gupta, Sabrina T. Howell, Constantine Yannelis, Abhinav Gupta, Does Private Equity Investment in Healthcare Benefit Patients? Evidence from Nursing Homes, Feb. 17, 2021, Becker Friedman Institute for Economics at University of Chicago, https://bfi.uchicago.edu/insight/finding/does-private-equity-investment-in-healthcare-benefit-patients-evidence-from-nursing-homes/; Alex Spanko, House Hearing Scrutinizes 'Horror' of Private Equity Investment in Nursing Homes, Skilled Nursing News, March 25, 2021, https://skillednursingnews.com/2021/03/house-hearing-scrutinizes-horror-of-private-equity-investment-in-nursing-homes/.

31.     The Facility was owned by Genesis Healthcare ("Genesis") before Hyman and Zanziper bought it effective February 1, 2020.  The premises were first a nursing home over 20 years ago starting in the 1980s.  Eventually, however, the Facility was bought by Genesis and for a period of years leading up to February 1, 2020, it was known as the "Salisbury Center" and operated as a for-profit facility.

32.     The conditions at the facility grew worse as Genesis sought to cut costs and divest assets to satisfy its loan obligations.  Genesis suffered financial reverses and became indebted to a private equity parent called Formation Capital. By 2014, Genesis was paying more than $750 million a year on interest, rent, and transaction fees and interest rates as high as 22.2 percent on some of its credit lines.[11]

33.     Labor is the single largest cost in running a nursing home.  Due to Genesis' financial condition, it sought to cut costs; the quality of services at the Facility deteriorated. The Genesis subsidiary was fined by NC DHSR.  On January 21, 2018, it was fined $10,143, on August 8, 2018, $13,627 and on August 13, 2019, $325,391 with regard to conditions at the Facility.[12]

34.     As of Fall 2019, the Facility was in poor condition, or Accordius nursing executive Sara Dieter has testified, "broken."[13]   Genesis sought to offload the building. Meanwhile, Hyman and Zanziper were on a shopping spree, focused on buying

---

[11] Maureen Tkacik, Despite Pandemic Carnage, Predatory Nursing Home Financiers Keep Thriving, April 14, 2021, The American Prospect. Available at https://prospect.org/health/despite-pandemic-carnage-predatory-nursing-home-financiers-thriving/.
[12] https://projects.propublica.org/nursing-homes/homes/h-345286.
[13] Dieter depo. p. 52.

"distressed" buildings that came on the market for a low price. During this time, Hyman, Zanziper and Portopiccolo were recklessly buying up facilities at a rapid rate without concern regarding the unsafe status of many of the facilities.

35.　　Hyman and Zanziper, while being aware of the dire conditions at the Facility, made no efforts to require Genesis to upgrade conditions prior to the sale. To the contrary, during this time Hyman and Zanziper were assuring prospective lenders that they would be able to cut millions of dollars of costs even after acquiring the new facilities.

36.　　On information and belief, in 2019, while acquiring three nursing homes in North Carolina, Portopiccolo represented to its lenders that it expected to save $360,000 by lowering expenses associated with employee benefits and insurance and $410,000 by cutting equipment and transportation costs. These measures, outlined in a mortgage loan contract, allowed Portopiccolo to save more than $50 million across 37 facilities it owned in the State.[14]

37.　　Once Hyman and Zanziper assumed control of the Facility via their wholly owned LLC entities on February 1, 2020, according to accounts both of staff members and of residents and sponsors,[15] facility conditions grew worse.

38.　　Hyman and Zanziper had grown their upstart new chain too fast and cut costs too much. Their enterprise lacked many of the basic management and support capabilities that even Genesis had offered. Nursing staff found themselves working in chaotic

---

[14] Tan and Chason 2020.
[15] See affidavits of staff and family/residents.

conditions[16] without support.  Hyman and Zanziper cut off contracts of vendors Genesis

had used.  The facility's situation worsened as the new owners refused to carry forward

paid time off and other pay and benefit agreements that Genesis had in place.  Many staff

left the Facility, no longer willing to work there.  These events occurred at the Citadel in

February 2020 before the advent of COVID-19 at the Facility, nor can Defendants blame

COVID-19 for their actions.

39.     Because of the Facility's dire conditions, it is no surprise that the Citadel

Salisbury became the site of one of the earliest and largest COVID-19 outbreaks at any

congregate care setting in North Carolina, as confirmed by testing of numerous residents

which occurred on April 10, 2020.  The management's handling of the pandemic crisis was

so poor and chaotic that it led to an open letter to the editor[17] written by a local emergency

room physician, and when the local hospital and health department conducted testing, they

learned that virtually all of the residents had contracted the virus.  Many deaths occurred

as a result.

_____

[16] Michael Gordon, Affidavits: Sickened nurses watched their nursing home patients die 'and die alone,' Charlotte Observer, May 8, 2020, at https://www.charlotteobserver.com/article242537791.html; Michael Gordon, This company owns dozens of N.C. nursing homes rated substandard. At one, COVID has killed 19, Charlotte Observer, June 12, 2020, at https://www.charlotteobserver.com/news/local/article242759916.html; Michael Gordon, Salisbury nursing home put residents in 'immediate jeopardy' of COVID-19, state says. 18 died, June 27, 2020, Charlotte Observer, available at https://journalnow.com/news/state/salisbury-nursing-home-put-residents-in-immediate-jeopardy-of-covid-19-state-says-18-died/article_070f894d-e9a9-517b-9824-58b4dcc1b2c1.html.
[17] John Bream: Outbreak at Citadel nursing home especially concerning, Salisbury Post, April 20, 2020, available at https://www.salisburypost.com/2020/04/20/john-bream-outbreak-at-citadel-nursing-home-especially-concerning/.

40. The understaffing and lack of supplies at the Facility was caused not by COVID but by the owners' business model. At other facilities also owned by Hyman and Zanziper in their chain, during the years of 2017, 2018, and 2019 – long before COVID – the data shows chronic failure to adequately staff. The facilities in the Hyman/Zanziper chain consistently dominate the list of worst-staffed facilities in North Carolina. If COVID was what caused the understaffing, then the understaffing should not have existed during these pre-COVID years.

41. The devastating results of the implementation of Defendants' business model to date can be demonstrated by the current "star ratings" of the facilities. CMS analyzes reported nursing home data and through its Nursing Home Compare website issues star ratings from a low of one to a high of five for all nursing home facilities that participate in the Medicare and Medicaid programs. The bottom 20% of facilities receive one star and the bottom 20 to 40% receive two stars, and so forth. The star ratings regarding staffing for the 36 Hyman/Zanziper facilities in North Carolina were as of April 17, 2021:

a. The Citadel Salisbury – Staffing: zero stars. This facility was not rated due to a history of serious quality issues. This nursing home was subject to more frequent inspections, escalating penalties, and potential termination from Medicare and Medicaid as part of the Special Focus Facility (SFF) program.

b. The Citadel Mooresville – Staffing: one star.

c. Accordius Health at Salisbury – Staffing: one star.

d. Accordius Health at Lexington – Staffing: one star.

e. Accordius Health at Concord – Staffing: one star.

f. Accordius Health at Mooresville – Staffing: one star.

g. Accordius Health at Clemmons – Staffing:  zero stars.  On the SFF list.

h. Accordius Health at Statesville – Staffing:  one star.

i. Accordius Health at Rose Manor (Durham area) – Staffing:  two stars.

j. Accordius Health at Midwood (Charlotte area) – Staffing:  two stars.

k. Accordius Health at Charlotte – Staffing:  one star.

l. Accordius Health at Gastonia – Staffing:  four stars.

m. Pelican Health at Charlotte – Staffing:  one star.

n. Pelican Health Randolph (Charlotte area) – Staffing:  three stars.

o. Accordius Health Gatesville – Staffing:  three stars.

p. Accordius Health at Creekside (Hertford County) – Staffing:  one star.

q. Accordius Health at Scotland Manor – Staffing:   three stars.

r. Accordius Health at Winston-Salem – Staffing:  two stars.

s. Accordius Health at Asheville – Staffing:  two stars.

t. Accordius Health at Greensboro – Staffing:  one star.

u. Carolina Pines at Greensboro – Staffing:  two stars.

v. Carolina Pines at Asheville – Staffing:  two stars.

w. Accordius Health at Brevard – Staffing:  one star.

x. Accordius Health at Wilmington – Staffing:  one star.

y. Accordius Health at Monroe – Staffing:  two stars.

z. The Citadel at Myers Park (Charlotte area) – Staffing:  one star.

aa. The Citadel at Winston-Salem – Staffing:  one star.

bb. The Citadel at Elizabeth City – Staffing:  one star.

cc. Accordius Health at Hendersonville – Staffing:  two stars.

dd. Pelican Health Henderson – Staffing:  three stars.

ee. Pelican Health Asheville – Staffing:   one star.

ff.  Accordius Health at Aberdeen – Staffing:  one star.

gg. Pelican Health Thomasville – Staffing:  one star.

hh. Pelican Health Reidsville – Staffing:  one star.

ii.  Accordius Health at Wilson – Staffing:  four stars.

jj.  Accordius Health at Rutherford – Staffing:   three stars.

42.    For these 36 facilities, the average star rating for staffing is only 1.6 stars. Further, beyond staffing, the Citadel Salisbury Nursing Home Compare star rating as of February 2020 was only one star overall.

43.    After Defendants took over control of the facility from Genesis on February 1, 2020, the star rating for the Citadel Salisbury went down from one to zero as it was placed on the SFF list[18] for the worst nursing home facilities in the nation and it is also currently flagged for abuse on the Nursing Home Compare website.

44.    There are currently seven facilities owned in whole or part by Simcha Hyman and/or Naftali Zanziper or with connections to Hyman that are on the SFF / SFF Candidate list (updated April 28, 2021):

---

[18] CMS, Special Focus Facility list, April 29, 2021, available at https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/Downloads/SFFList.pdf

      i.     The Citadel Salisbury (NC).[19]
     ii.     Accordius Health at Clemmons (NC).[20]
    iii.     Oakhurst Center (FL).[21]
    iv.     Orchid Cove at Vero Beach (FL).[22]
     v.     Palm Vista Nursing and Rehabilitation Center (FL).[23]
    vi.     Ivy at Davenport (Iowa).[24]
   vii.     Peak Healthcare at Caton Manor (MD).[25]
  viii.     The Citadel at Myers Park (NC).[26]
    ix.     The Ivy at Gastonia (NC).[27]

---

[19] As of 5/4/21, owned by Simcha Hyman and Naftali Zanziper.
https://www.medicare.gov/care-compare/details/nursing-home/345286?city=SALISBURY&state=NC&measure=nursing-home-ownership.
[20] Same. https://www.medicare.gov/care-compare/details/nursing-home/345131?city=CLEMMONS&state=NC&measure=nursing-home-ownership.
[21] Same. https://www.medicare.gov/care-compare/details/nursing-home/105465?city=Ocala&state=FL&zipcode=34471&measure=nursing-home-ownership.
[22] Nursing Home Compare does not show Hyman or Zanziper, but, they own Orchid Cove Health Group LLC. It may be that they provide management for the property.
[23] Owned by Hyman and Zanziper. https://www.medicare.gov/care-compare/details/nursing-home/106089?city=Key%20West&state=FL&zipcode=33040&measure=nursing-home-ownership
[24] Latest Nursing Home Compare page shows owner as Accordius Health at St Mary, LLC with Simcha Hyman as a co-owner along with family relative Chaim Hyman and a person named Ryan Coane. https://www.medicare.gov/care-compare/details/nursing-home/165436?city=DAVENPORT&state=IA&measure=nursing-home-ownership.
[25] Owned by Hyman and Zanziper. https://www.medicare.gov/care-compare/details/nursing-home/215085?city=Baltimore&state=MD&zipcode=21229&measure=nursing-home-ownership
[26] Same. https://www.medicare.gov/care-compare/details/nursing-home/345008?city=Charlotte&state=NC&zipcode=28207&measure=nursing-home-ownership
[27] Owned by Chaim Hyman and Ryan Coane. https://www.medicare.gov/care-compare/details/nursing-home/345307?city=Gastonia&state=NC&zipcode=28056&measure=nursing-home-ownership.

17

45.     When Hyman and Zanziper bought the Facility, they set up a convoluted

network of business entities in an effort to avoid liability:

    a.   The "propco":  This LLC entity owned 50/50 by Hyman and Zanziper would purchase and own the real estate.  The entity was organized under North Carolina law as Salisbury Two NC Propco LLC on November 18, 2019.

    b.   The "opco":  This entity owned by Hyman and Zanziper would hold the license to operate the facility and lease the premises from the propco. The entity was organized under North Carolina law as The Citadel Salisbury LLC on November 18, 2019.

    c.   The management company:  Hyman and Zanziper own an entity to provide management services to facilities in their chain.  The entity was organized under North Carolina law as Accordius Health LLC on March 27, 2019.

    d.   The ultimate controlling entity:  Hyman and Zanziper organized Portopiccolo to control and oversee all operations.  They have only conceded that Portopiccolo provides "back-office services;" in truth, it does much more. Portopiccolo was organized under New Jersey law on January 19, 2018.

    e.   The staffing agency:  after having disputes with outside staffing vendors over prices, Hyman and Zanziper organized a staffing company, Daisy Staffing LLC, to provide contract nursing labor to the Citadel facility as well as to others in the chain.  It was organized under North Carolina law on April 14, 2020. Thus, one has the spectacle of a company wholly owned by Hyman and Zanziper, acting as an ostensible outside contract labor agency for another entity wholly owned by Hyman and Zanziper.  When asked on the subject, top management at The Citadel had no idea who owned Daisy.

46.     When Genesis sold the operations to The Citadel, Genesis sold the premises

to Salisbury Two NC Propco LLC.  Salisbury Two NC Propco LLC and The Citadel, both

formed on November 18, 2019, have Hyman and Zanziper as their members.  Salisbury

Two Propco LLC leases the property to The Citadel.  Thus, one entity owned by Hyman

and Zanziper leases the premises to another entity owned by Hyman and Zanziper, for an

unknown amount of money.  When asked, top local management at The Citadel had no

idea who owned the premises of their facility or how much in rent or other payments were being made, or, to whom.

47. Sherri Stoltzfus is the state-licensed administrator of the Facility. Under 10A NCAC 13D .2201(c), "[t]he administrator shall be responsible for the operation of a facility." (Emphasis added). Yet unlike in other nursing homes, such as local nonprofit facilities, the licensed Administrator, Ms. Stoltzfus, was frozen out of all significant knowledge or involvement in operational financial matters by Portopiccolo, Hyman and Zanziper.[28] She was not allowed to know what the chain's resources were nor its budget. She lacked knowledge of the terms of contracts with vendors and lacked other operational control. She had no power to increase staffing quantity or quality despite having a state-licensed role that was supposed to confer upon her such authority. Rather, Hyman and Zanziper kept that knowledge and control to themselves and accordingly are individually jointly and severally liable along with their ownership company, Portopiccolo, as they have effectively assumed the role of statutory administrator unlawfully and in derogation of the applicable statutes.

---

[28] From *Marshall v. Accordius, supra,* Sherri Stoltzfus depo. 10/28/20 pp. 23 (doesn't know who owns Daisy Staffing), 32-33 (information on wages to pay workers is given to her from above), 35 ("Q. Does the facility have a budget? A. No."), 36 (does not know where accounts payable are managed), 47 (does not know whether the Citadel Salisbury, LLC pays rent to Salisbury Two NC Propco LLC; does not know whether any monies are assigned to the lender, Oxford Finance; does not know whether a management fee gets paid to Accordius Health LLC), 86-87 ("I don't see the bills."), 25, 41, 106, 125, 146, 227 (does not know contents of contracts with vendors or staffing agencies nor what they are paid nor who negotiates them), 112 (she had to pay based on a "wage analysis" set by someone else).

19

48.     During the pertinent times, Defendants Portopiccolo, Hyman and Zanziper by sequestering all financial knowledge and control to themselves, unlawfully usurped and assumed the role of being the facility administrator.

49.     Under their corporate structure, Hyman and Zanziper ran all such matters through Portopiccolo and excluded the facility administrator, Stoltzfus, from having any information, knowledge, or control regarding loan and security arrangements, costs, contracts, or budgets.  To the extent that effectively administering a facility entails being able to pay workers, raise wage scales, add new positions, hire and fire vendors, and have an understanding of the facility's revenues and profitability, Stoltzfus was deprived of her ability to perform her job.  Hyman, Zanziper and Portopiccolo by their business model violated the North Carolina and federal[29] laws requiring the local administrator to have knowledge, authority, and control.

50.     When the ownership change occurred, the management company, Accordius, sent a form letter to the families.  In it, Accordius COO Kim Morrow promised that the new owners would provide "5-Star" service:

---

[29] *See* 42 CFR § 483.70(d)(2) (describing that "the administrator … is … (ii) Responsible for management of the facility"); N.C.G.S. § 131E-121 ("Responsibility for implementing the provisions of this Part shall rest on the administrator of the facility.").

> February 1, 2020
>
> Dearest Resident, Family Member, Responsible Party
>
> I am writing to introduce myself and welcome you to the Accordius family. On February 1, 2020 Accordius Health purchased Salisbury Center and now operates as The Citadel Salisbury. It is our intention to bring our quality standards, best service and provide safe, competent care to you and your loved one. We are working hard to transition all staff to our unique culture and deep focus on quality of life.
>
> We are a small privately-owned and operated company, that is rooted in quality and community. We believe that if we treat each other like family and genuinely care for residents, families and staff; then quality and expected outcomes will follow. Our home office is located in Charlotte, North Carolina and our entire regional and support staff are in the field continuously ensuring that our 5-Star service and Core Values are maintained.

51.    The assurance of "5-Star Service" was false. As of February 2020, the facility was only a one-star facility according to CMS.[30] Today, it has no stars.

52.    As noted, the facility was troubled before The Citadel took over, having on August 13, 2019 been fined $325,391.[31] Hyman and Zanziper knew this when they decided to buy the facility. They had every opportunity to vet the facility prior to acquiring it and prior to sending a change of ownership application to the NC DHSR on November 26, 2019. The new owners knew that consistent with their business plan of aggressive growth,

---

[30] The official nursing home compare program rates nursing homes on a one- to five-star scale. One star means the facility is in the bottom 20% of all facilities. *See generally Temple Estate of Temple v. Providence Care Center, LLC*, 233 A.3d 750, 754 n.3 (Pa. 2020) (explaining that CMS created the Five-Star Quality Rating System to help compare nursing homes and the website "features a quality rating system that gives each nursing home a rating of between 1 and 5 stars. Nursing homes with 5 stars are considered to have much above average quality and nursing homes with 1 star are considered to have quality much below average"). *See also* CMS, "Five-Star Quality Rating System," Oct. 7, 2019, available online at www.cms.gov.
[31] https://projects.propublica.org/nursing-homes/homes/h-345286.

they could not purchase high-quality facilities unless they paid top dollar. They purchased the worst facilities that other owners were seeking to offload.

53. That November 26, 2019 document, signed by Zanziper, represented that the facility would be operated by The Citadel and managed by Accordius with an office address of 440 Sylvan Avenue, Suite 240, Englewood Cliffs, New Jersey 07632. That is the identical office address used by Portopiccolo. Portopiccolo also has sent various communications and letters to state regulators under its own name with regard to facility matters for facilities in North Carolina.[32]

54. The deed of sale for the real property for The Citadel was recorded on February 4, 2020.[33] In it, the revenue tax is $31,285.

55. While as noted, on paper The Citadel Salisbury LLC, as opco, holding the license with the State to operate, pays rent to Salisbury Two NC Propco LLC, as the landlord, aka the propco, it is believed that under complex loan arrangements, the rent actually goes to the benefit of a third party, Oxford Finance LLC.

56. On the same day, February 4, 2020, that the deed from the Genesis company to Salisbury Two NC Propco LLC was recorded, a second deed was also recorded.[34] This second deed conveyed the property along with fixtures, leases and rents to a trustee to hold for the benefit of Oxford Finance LLC, as security in return for a loan in the amount of $58,650,000 that Oxford had made to other companies owned by Hyman and Zanziper:

---

[32] E.g., https://info.ncdhhs.gov/dhsr/coneed/reviews/2019/may/multi_nh.pdf.
[33] Rowan County Register of Deeds, Book 1342, Page 789.
[34] Book 1342, Page 790.

Case 1:21-cv-00384-TDS-JLW   Document 1   Filed 05/17/21   Page 22 of 79

Liberty Rd Randallstown MD Propco LLC,[35] and Mooresville Two NC Propco LLC.[36] This instrument provided for additional loans up to a limit of $117,300,000. A second recorded instrument dated February 4, 2020 secured an additional $6 million loan, related this time to three of the "opcos" in the chain: Liberty Rd Randallstown MD Opco LLC, The Citadel Mooresville LLC, and The Citadel Salisbury LLC.[37]

57.     On April 2, 2020, a new instrument was recorded amending the February 2020 instrument reciting the loan of $58,650,000,[38] adding Wilkens Ave Baltimore MD Propco LLC[39] as a borrower, and adding a new loan amount of $16,025,000, making for a total secured loan now of $74,675,000. Another instrument recorded on April 2, 2020[40] amended the prior loan of $6,000,000, adding Wilkens Ave Baltimore MD Opco LLC as a borrower, and increasing that loan to $8,000,000. The credit and security agreement listed Liberty RD Randallstown MD Opco LLCF, The Citadel Mooresville LLC, The Citadel Salisbury LLC, and Wilkens Ave Baltimore MD Opco.

58.     Since February 1, 2020, the facility has suffered facility wide from chronic and systemic understaffing among other deficiencies and failures.   These failures are a

---

[35] Liberty Rd Randallstown MD Propco LLC is the propco for Patapsco Health and Rehabilitation, at 9109 Liberty Rd, Randallstown, MD 21133-3521.  Its opco is believed to be Liberty Rd Randallstown Md Opco LLC.

[36] Mooresville Two NC Propco LLC is the propco for The Citadel Mooresville, at 550 Glenwood Drive, Mooresville, NC 28115-2876.  Its opco is The Citadel Mooresville LLC.

[37] Book 1342, Page 792.

[38] Book 1346, Page 127.

[39] Wilkens Ave Baltimore MD Propco LLC is the propco for Peak Health at Caton Manor, at 3330 Wilkens Ave., Baltimore, MD 21229.  Its opco is Wilkens Ave Baltimore MD Opco LLC.

[40] Book 1346, Page 128.

matter of corporate management policies and the enterprise's business model, not standard of care judgments made by the medical director Dr. Yut[41] or other individual medical professionals at the facility.

**B.**     **Facts regarding Sybil Rummage and Sonya Hooker.**

59.     Sybil Rummage was admitted to the Julian Road facility on September 19, 2015.  She was born in 1948 and is in her 70s.  She has physical impediments; she has severe arthritis and is bedridden; she has difficulty closing her hands.  But her mind is sharp. She talks often by phone with her daughter, Sonya Hooker, who is her sponsor. Sybil has Medicaid coverage.[42] Sybil and Betty Deal and the putative resident class seek recovery of breach of contract damages reflecting all private payments, all monies paid by Medicaid on their behalf,[43] and/or, reflecting the reasonable value of the services and supplies they should have received less the value of what she received.

60.     There are incomplete records in Sybil's chart regarding her admission agreement and related forms dating back from when she was originally admitted while the facility was owned by Genesis.  One form recites that when Ms. Rummage was originally admitted in 2015, the facility promised that "the Center will provide necessary care and services to help Resident/Patient attain or maintain the highest practicable physical, mental

---

[41] Plaintiffs are informed and believe that Dr. Yut has recently left the facility.

[42] Sonya Hooker corrected affidavit ¶¶ 4-5, RUMMAGE, SYBIL_000001-2.

[43] Plaintiffs allege that they are entitled to a refund of damages from the Medicare and Medicaid payments that were made to the facility on their behalf.  *See Salas v. Grancare, Inc*., 22 P.3d 568 (Colo. Ct. App. 2001) (reversing lower court order that found that plaintiffs alleging nursing home understaffing had to exhaust administrative remedies against Medicare or Medicaid to allege damages in the form of assigned Medicare and Medicaid payments).

and psychosocial well-being…."[44] During the pertinent times, The Citadel had either an express or an implied-in-fact contract to provide Sybil Rummage, Betty Deal and class members with nursing home care and services to help each resident attain or maintain the highest practicable physical, mental and psychosocial well-being.

61. Sybil's Citadel chart also contains a Genesis form entitled, "admission agreement."[45] However, it is not a complete document. It recites numerous other documents, many of which are not in the copy of the chart that was later provided to the family by the new owners, The Citadel.

62. Because complete copies of the Genesis admission agreement materials were not seen in her file nor provided to the family at the time of admission, and because new admission materials with The Citadel were not provided at the time the new owners took over the operations on February 1, 2020, The Citadel violated N.C.G.S. § 131E-117(3)[46] and § 131E-120(a),[47] which require complete admission agreement materials to be

---

[44] RUMMAGE, SYBIL_007024.

[45] RUMMAGE, SYBIL_007044.

[46] N.C.G.S. § 131E-117 ("All facilities shall treat their patients in accordance with the provisions of this Part. Every patient shall have the following rights … (3) To receive at the time of admission and during the stay, a written statement of the services provided by the facility, including those required to be offered on an as-needed basis, and of related charges. Charges for services not covered under Medicare or Medicaid shall be specified. Upon receiving this statement, the patient shall sign a written receipt which must be on file in the facility and available for inspection[.]").

[47] N.C.G.S. § 131E-120 ("(a) A copy of G.S. 131E-115 through G.S. 131E-127 shall be posted conspicuously in a public place in all facilities. Copies of G.S. 131E-115 through G.S. 131E-127 shall be furnished to the patient upon admittance to the facility, to all patients currently residing in the facility, to the sponsoring agency, to a representative payee of the patient, or to any person designated in G.S. 131E-118, and to the patient's next of kin, if requested. Receipts for the statement signed by these persons shall be retained in the facility's files. (b) The address and telephone number of the section in the

maintained and updated. When Citadel took over effective February 1, 2020, it had a duty to either ensure full admission documents were in the patient chart carried-over from Genesis, if it planned to abide by those older documents and their provisions – or, The Citadel had a duty to offer all-new admission agreement materials and obligatory statutory disclosures and place them in the file for the resident. By failing to meet its statutory disclosure requirements, The Citadel is liable.

63.     Defendants Accordius and Portopiccolo are jointly and severally liable with the Citadel for the failure to provide appropriate agreements and disclosures as required by statute due to those entities' direct material involvement in facility operations. On information and belief, all forms used by The Citadel and contracts that it has used since February 1, 2020 have been drafted by Portopiccolo.

64.     Said Defendants' failure to provide the required agreements and disclosures constituted an unfair or a deceptive trade practice affecting interstate commerce under N.C.G.S. 75-1.1, *et seq.*

65.     The purpose of N.C.G.S. § 131E-117(3) and § 131E-120(a) is to ensure the NC Patient Bill of Rights provisions are incorporated into any admission agreement. Clearly, the Bill of Rights governs care at this facility. The Bill of Rights, N.C.G.S. § 131E-117, says, among other things, that "[a]ll facilities shall treat their patients in accordance with the provisions of this Part;" that "[e]very patient shall have the following

---

Department responsible for the enforcement of the provisions of this Part shall be posted and distributed with copies of the Part. The address and telephone number of the county social services department shall also be posted and distributed.").

rights: … [t]o be treated with consideration, respect, and full recognition of personal dignity and individuality;" that every resident has the right "[t]o receive care, treatment and services which are adequate, appropriate, and in compliance with relevant federal and State statutes and rules;" that they each have a right "[t]o receive at the time of admission and during the stay, a written statement of the services provided by the facility, including those required to be offered on an as-needed basis, and of related charges;" that each resident has a right to "receive respect and privacy;" that each must be "free from mental and physical abuse;" that they have a right "[t]o receive from the administrator or staff of the facility a reasonable response to all requests;" and so forth.

66.     The Bill of Rights further provides at § 131E-121, Responsibility of administrator, that "[r]esponsibility for implementing the provisions of this Part shall rest on the administrator of the facility."  However, during the pertinent times, Defendants refused to allow Sherri Stoltzfus, as the administrator, to have the ability or authority to know the facility's financial information, revenues, expenses, or budget, so as to effectively be able to implement the law and manage the operation.

67.     Defendants failed to provide the statutorily required disclosures or contract to Ms. Rummage at the time they took over the facility, and further intentionally concealed and failed to disclose the actual nature of the Defendants' chronically understaffed and low-quality business model, already established in others of its North Carolina facilities.

68.     If Defendants had properly and accurately made their statutory disclosures and otherwise disclosed the true state of affairs when they took over the facility, then

27

Plaintiffs would have sought to obtain state intervention, sought relocation, or taken other action in an effort to protect themselves and other residents.

69. Plaintiffs reasonably relied on the representations, assurances and actionable omissions made and caused by the Defendants at the time that Defendants assumed control and ownership over the facility on or about February 1, 2020; they relied on said representations, assurances, and actionable omissions to their detriment; as a direct and proximate cause, they were damaged thereby.

70. When Sybil Rummage was admitted to the facility, the level of service provided by Genesis was mediocre. Then, the level of service drastically declined after February 1, 2020. Sybil Rummage and her sponsor, her daughter Sonya Hooker, observed chronic lack of staffing and supplies including medications.

71. When Sybil first was admitted to the facility in 2015, the level of service and supplies provided by Genesis was better than that later provided by the new ownership after February 1, 2020 when the name of the facility became the Citadel Salisbury.[48]

72. Due to her growing concern regarding the deteriorating staffing and quality of care and the approaching COVID pandemic, Sonya kept notes, beginning as early as March 2020, regarding events that were occurring at the nursing home, which were later converted over into affidavit form.[49]

---

[48] Sonya Hooker corrected affidavit ¶ 19.
[49] *Id.* at ¶ 21.

73.     Between March 9 and 30, 2020, the facility was locked down; there were no longer any outside visitors allowed.[50]  On March 30, 2020, Sybil was told the Citadel staff were quarantining a resident for a high fever.[51]

74.     On April 3 or 4, 2020, Sybil's roommate began running a fever and coughing. Sybil asked the staff why they were not quarantining the roommate but did not get an answer.  She was told to "keep her curtain pulled" in case her roommate had COVID.  This curtain acted as a privacy separator between the two halves of the room.  The room had two beds, with roommates. They shared a bathroom with the two people in the room next door. The curtain was meant for privacy and could not be drawn the whole way across.[52]

75.     On April 7, 2020, someone from "Accordius" telephoned Sonya to advise that there was one positive case of COVID at the facility. They would not give her any additional information nor answer any questions.[53]

76.     On April 9, 2020, Sybil was not given her heart medicine.  In this regard, Sybil has a diagnosed cardiac condition, atrial fibrillation, for which it is important that she receive her prescription medication in the right dosage at the right time each day. When Sybil received her medications that night, she had a different pill in place of one of her normal heart medications. She questioned it and the nurse assured her it was the correct

---

[50] *Id.* at ¶ 23.
[51] *Id.* at ¶ 22.
[52] *Id.* at ¶¶ 25-26.
[53] *Id.* at ¶ 27.

one. She finally took the pill. A later review of her chart, however, reflected that her prescribed dose was 10 mg yet the dose she was administered was 40 mg.[54]

77.    By April 10, 2020, Sybil had been without her heart medicine for 24 hours. Further, the staff had not properly been taking the temperature of Sybil for two days at this point. Sonya called the Citadel several times and finally got someone to answer. They said they would have the social worker call her back.  When the social worker did call, she admitted that a staff person had falsely reported on the computerized resident chart that Sybil had been receiving her medications when, in fact, she had not, because they were out of the relevant medications.  In other words, she admitted the records were false.  The social worker also admitted that one or more staff personnel had falsely recorded in the chart that the staff was taking the temperatures of the residents, when, in fact, they were not doing so.  In this regard, it is important to understand that Sybil, while physically disabled, is mentally sharp, and observant, and this fact was known to the social worker, and may have led her to admit the facts.  One can only surmise as to the integrity of the chart records for other facility residents without the mental acuity to report actual occurrences to confirm falsified records entries.[55]

78.    Also on April 10, 2020, Sybil reported to Sonya that the residents on that day had nasal swabs administered to obtain samples to send to a laboratory to be analyzed for COVID status.[56]

---

[54] *Id.* at ¶ 28.
[55] *Id.* at ¶¶ 29-32.
[56] *Id.* at ¶ 33.

79.     On April 11, 2020, Sybil stated that her temperature was taken and reflected a slight fever, 99 degrees. The nurse took the temperature under her arm because they were out of supplies – specifically, the disposable sleeves that they would need to use a thermometer orally. The staff person admitted that they had previously failed to take residents' temperatures because they were out of the sleeves.[57]

80.     On April 13, 2020, Sonya heard from an acquaintance employed in health care that the Citadel Salisbury had 75 positive cases; in fact, the number was significantly higher. Concerned and wanting to confirm this fact, Sonya telephoned the Citadel several times but could not get an answer.[58]

81.     During the March/April 2020 time frame, Sybil observed that staff persons were not wearing masks or gloves. They would come in her room without masks. One or more nursing staff informed Sybil that they wanted to wear protective gear, but they could not and that the masks were locked up. Also, staff persons were not wearing disposable or washable gowns that they could change between rooms, or other personal protective equipment (aka "PPE").[59]

82.     On April 14, 2020, Sonya tried calling the Citadel Salisbury multiple times to learn about the COVID status. It took multiple calls before someone answered the phone.

---

[57] Sonya Hooker corrected affidavit ¶ 34.
[58] Id. at ¶ 35.
[59] Id. at ¶ 36.

Case 1:21-cv-00384-TDS-JLW   Document 1   Filed 05/17/21   Page 31 of 79

But they would not give her an answer. On the internet news media, WBTV was reporting 75 positive cases at the Citadel. Dr. Yut informed Sybil that she had tested positive.[60]

83. By April 16, 2020, Sybil had not been getting her prescribed Mucinex for several days, so Sonya telephoned the administrator (Sherri Stoltzfus) who promised to correct things. They gave Sybil a liquid form of Mucinex that night. It is typically a pill. Sybil asked if it was regular Mucinex because she could not take any of the ones that have antihistamine because of her heart condition. The staff assured her it was the regular kind not the kind with antihistamine. She asked why she had not been getting it for days if they had the liquid form all along. The staff said they were not sure.[61]

84. On April 17, 2020, Sonya felt that something was not right about the Mucinex issue. She researched Mucinex online. She could not find the regular kind in liquid form. She called The Citadel and asked for the social worker. The staff said she was out sick. They transferred Sonya to a nurse, and Sonya explained her concerns about the Mucinex. The nurse admitted they were giving her mother the Fast Max liquid version — which is the version that the family understood Sybil could not take because of her heart. Sonya asked the nurse if she could buy the kind of Mucinex product that her mom needed, from a pharmacy and drop it off at the facility door. The nurse said yes.[62]

---

[60] Sonya Hooker corrected affidavit ¶ 37; RUMMAGE, SYBIL_000002 (diagnosed for COVID on 4/14/20); RUMMAGE, SYBIL_006305 (same). On 4/7/20, per the facility records, a nurse there called and informed Ms. Hooker that another resident had tested positive: "This writer contacted Mrs. Rummage's daughter Sonya and notified her of a positive COVID 19 testing of one of our residents in the facility." RUMMAGE, SYBIL_004685.

[61] Sonya Hooker corrected affidavit ¶¶ 40-41.

[62] *Id.* at ¶ 42.

85.     Also on April 17, 2020, Sonya went out and bought the Mucinex pills. When Sonya arrived to drop them off at the nursing home, she was told the nurse was wrong in telling her that she could drop the medications off.  The person who came to the door said she had purchased 60 tablets so that Sybil would have plenty.  Sybil later told Sonya that she finally received the proper Mucinex tablets that night.[63]

86.     On April 22, 2020, Sybil said that the facility ran out of Mucinex again.  Sybil was told they had used it all because other residents were needing it also.[64]

87.     On April 23, 2020, Sonya called and left a message with the facility complaining about them being out of the right safe kind of Mucinex. Someone who identified herself as "Lynn from Accordius" called to tell Sonya some of the steps they were taking at the facility. Sonya told her about the Mucinex issue. The lady said she would inquire. Sybil did get the right kind of Mucinex that night.[65]

88.     On April 24, 2020, Sybil was not given one of her heart medications because the Citadel was out.[66]

89.     On April 25, 2020, Sybil was not given her dose of the heart medication that morning. Lynn from Accordius called to follow up on the Mucinex issue. Sonya told her about the heart medication issue. Later Sybil confirmed to Sonya that she did get the heart medicine that night.[67]

---

[63] Sonya Hooker corrected affidavit ¶ 43.
[64] *Id*. at ¶ 44.
[65] *Id*. at ¶ 45.
[66] *Id*. at ¶ 46.
[67] *Id*. at ¶ 47.

90.     Staffing was short much of March and April 2020 at the Citadel. Sonya called and placed a complaint with the State about the short staffing, missing medicines, improper dosages, failure to quarantine sick residents, etc.  She placed her complaint during the week of April 20, 2020. There were days where there was only one CNA per hall. There were days where there were only three CNAs for the entire building. The state inspector called Sonya on April 25 to say that inspectors were at the facility. After that visit by the state, Sybil noticed that there were more staff members present, for a time.[68]

91.     On May 2, 2020, Sybil told Sonya that there was only one CNA there for her hall for at least one of the shifts.[69]

92.     On May 5, 2020, the management tried to get everyone out of their rooms so they could do cleaning. The management placed Covid-positive and negative residents together in the lobby. The residents were wearing masks.  Sonya refused to leave her room because of safety worries.[70] Also that date, thefront desk worker came to the Citadel front door with no mask on when Sonya stopped by to drop something off for Sybil.[71]

93.     Also on May 5, Sybil was not given her 2 p.m. medicines. When she was later given her 5 p.m. medicines, the pain pill from 2 p.m. was not there but the other 2 p.m. medicine were.  The staff person argued with Sybil and told her mom that she did get

---

[68] Sonya Hooker corrected affidavit ¶ 48.
[69] *Id*. at ¶ 49.
[70] *Id*. at ¶ 50.
[71] *Id*. at ¶ 51.

the pain pill. Later, the person went and checked and told Sybil that she, the staff person, was mistaken and that Sybil was right.[72]

94.     Sybil's facility roommate, Charlotte, was put in a sweatshirt on Tuesday, May 5th, in the morning. She was still in the same sweatshirt as of Wednesday, May 6th. The facility had not changed her clothes to keep her in clean clothes.[73]

95.     Lynn from Accordius had told Sonya that they were going to test everyone at the Citadel for COVID again on May 8, 2020.  In fact, Sybil was not tested on the 8th.[74]

96.     On May 8, 2020, Sybil never got her night medication. She did not see a nurse after 6:30 p.m.  She kept asking her CNA to get the nurse, who never came. When the 11 p.m. nurse came on for her shift, she told Sybil that she could not give Sybil her medications because the evening nurse (Bobbie) made no notations about anything on the computer.  Sybil's roommate, Charlotte, did not get her medications either. (Bobbie is also the same nurse that argued with Sybil about her pain medications on May 5, 2020).[75]

97.     On May 9, 2020, the morning nurse said a lot of residents did not get their medications that day. At 10:30 a.m., Sybil still had not gotten her morning medications. She was in a lot of pain because of missing her night-time pain medications, and then with her morning pain pill late.  Sonya repeatedly called the front desk, and it would ring and then go to what sounded like a fax machine sound. Sonya called the so-called Accordius hotline also and got no response. Lynn from Accordius finally called Sonya back, and

---

[72] *Id*. at ¶ 52.
[73] *Id*. at ¶ 53.
[74] *Id*. at ¶ 54.
[75] *Id*. at ¶ 55.

35

Sonya told her everything that happened. Sonya also asked why they had not retested the residents for COVID-19 like they had promised. Lynn said she did not know. She said she thought that they ran out of tests.[76]

98.　On May 10, 2020, Sybil told Sonya that the night shift CNA was rude to her. Sybil asked for water; the staff person told her she would have to wait and walked by her to turn off her light.[77] Sybil told Sonya that the facility missed giving Sybil the scheduled dose of her heart medicine (Rythmol) at night when she was supposed to receive it.[78]

99.　On May 11, 2020, the facility failed again to provide her heart medicine (Rythmol) in the morning. The facility failed to provide Sybil's "HZT" medicine at 2 p.m. -- a medicine she is supposed to get three times a day.　The facility failed to provide Sybil with all of her 5 p.m. medications.　Sybil repeatedly asked for a nurse and Sonya kept calling until Sherika answered the phone at 8:50 p.m.[79]

100.　On May 12, 2020, Sybil told Sonya that the facility had missed her 2 p.m. insulin dose.[80]

101.　On May 14, 2020, Sybil told Sonya that the Health Department said that people needed to move rooms at the facility. There had to be a recovery hall, a hall for residents who were COVID negative, and a hall for residents who were COVID positive. The management had Sybil and her roommate, Charlotte, moved to room 207. But when

---

[76] Sonya Hooker corrected affidavit ¶ 56.
[77] *Id*. at ¶ 57.
[78] *Id*. at ¶ 58.
[79] *Id*. at ¶¶ 59-61.
[80] *Id*. at ¶ 62.

Sybil got there, the room had not been cleaned out. Nor had the prior residents' personal items been taken out.[81]

102.    On May 17, 2020, Sybil still did not have all her things in her new room. The CNA went to her old room to get her a nightgown for that night. The CNA said there were still people on that hall and that her mother's personal items were not in the drawers.[82]

103.    On June 8, 2020, Sybil told Sonya that the staff missed providing her with her dose of the Rythmol medication, both morning and night.[83]

104.    Circa July 20, 2020, Sonya learned from Sybil that second shift was still understaffed. Second shift, by their understanding, ran from about 3 pm to 9 or 10 pm when third shift took over. There were three shifts.  As of July 2020, Sybil was in room 207, part of the 200 hall.[84]

105.    In July 2020, Sybil told Sonya what two of the CNAs quit. On one occasion, nobody showed up for second shift. They did not have anybody until one of the first shift people who had left, stopped at the gas station, and came back because she felt guilty for all the residents who were left with no staff to help them.[85]  Also in July, the management had somebody on staff stay from first shift until 7 pm. And then they had two of the third shift people to come in at seven, in other words, come in early.[86]

---

[81] Sonya Hooker corrected affidavit ¶ 63.
[82] *Id*. at ¶ 64.
[83] *Id*. at ¶ 67.
[84] *Id*. at ¶¶ 3, 7-8.
[85] *Id*. at ¶ 9.
[86] *Id*. at ¶ 10.

106.    On July 4 and 5, 2020, once each day, Sybil had a call light on for over an hour.  She told Sonya about that around the time it happened. The call light system was how the residents in the rooms were supposed to be able to notify that they needed help or assistance, without having to physically get out of their bed and go out of their room to try to find someone to help them.  (And many could not move if they wanted to).  On multiple occasions, when Sybil pushed her call light to obtain staff assistance, nobody responded to it for up to an hour or more.[87]

107.    As of July 2020, the quality of the food at The Citadel was terrible. According to Sybil, the food was low-quality, over-cooked into mush, the same food served numerous times, and so forth.[88]

108.    Sybil's normal way of bathing was a sponge bath in the bed.  She preferred to get the sponge bath once a day. In the past, Sybil would receive one between ten and eleven a.m. But as of July 2020, on multiple occasions, because of the understaffing she would not get a sponge bath until 4 or 5 p.m.

109.    Sybil noticed that the level of service declined not only because of sheer lack of staff, but also, because of the use of transient "agency" staff who as contract workers would come and go.  The facility was relying on many nursing staff provided by staffing agencies, who were not regular, full-time employees.   This practice worsened on the weekends.[89]

---

[87] Sonya Hooker corrected affidavit ¶ 13.
[88] Id. at ¶ 14.
[89] Id. at ¶ 15.

110. The contract staff because of their transient nature would not know resident preferences and schedules nor their personalities, needs, or habits. Because of understaffing, the contract nurses could also be overworked and lack time to learn procedures and resident preferences. Thus, for example, an agency nurse would neglect to provide Sybil with her sponge bath at her proper time, because the agency nurse did not know Sybil's regular routine or preferences.

111. Sybil and Sonya participated in a "care plan call" on July 15, 2020. The call involved various staff and representatives of the facility, and the discussion concerned Sybil's status and her care plan. During the call, one representative admitted that the facility was understaffed. Sybil and Sonya brought up the call light issues including that which occurred on July 4 and 5 when Sybil would press the call light yet would not obtain staff assistance for an unacceptably long period of time.[90]

112. A prior care plan meeting had occurred in or about February 2020. On that occasion, Sonya and Sybil required a chair to keep Sybil's legs elevated. A facility representative promised that the facility would put in the order for the chair. However, the chair was never provided. At the subsequent care plan meeting on July 15, 2020, Sonya requested the chair again. Once again, the representative promised it would be brought.[91]

113. During the February 2020 care plan meeting, Sonya complained about how the facility did not have the proper size and kind of adult pullup brief that Sybil needed. At that time, one of the staff persons in the meeting complained that her own grandmother,

---

[90] Sonya Hooker corrected affidavit ¶ 16.
[91] *Id.* at ¶ 17.

who was a facility resident, had not been provided with supplies that she needed either. From time to time, Sybil noticed residents who were being allowed to walk around with no briefs or "Depends"-style or other undergarments on.[92]

114. Sometime after that February 2020 meeting, Sybil developed a bedsore because she was wearing the incorrect size and type of adult undergarment brief. Sonya began to order adult undergarments for Sybil for which she paid out-of-pocket. When Genesis ran the facility, Sybil did get her proper-sized adult briefs.[93]

115. Ms. Rummage is NC Medicaid beneficiary, and adult diapers are among the supplies listed in the NC Medicaid Nursing Facilities Clinical Coverage Policy that must be provided to residents as part of the per diem reimbursement rate paid to the facility. Adult diapers are required as part of the per diem reimbursement from Medicaid and should not have to be paid for out-of-pocket by family members.[94]

116. During one or more of the care plan meeting, Sonya and Sybil also brought up the facility failing to timely provide Sybil with needed medications. Toward the end of 30-day periods, Sybil would run out of her heart medication among other medicines.[95]

117. Since The Citadel assumed operations of the facility, nearly each month at the beginning of the month, the facility failed to timely order and/or deliver Sybil's

---

[92] Sonya Hooker corrected affidavit ¶ 17.
[93] *Id*. at ¶ 17.
[94] *See* NC Medicaid Clinical Coverage Policy for Nursing Facilities, pp. 33-39, available at https://files.nc.gov/ncdma/documents/files/2B-1_2.pdf (listing items that must be included as part of the per diem reimbursement rate).
[95] Sonya Hooker corrected affidavit ¶ 18.

Rythmol medication to her.[96] Rythmol is a medication used to treat certain types of serious (possibly fatal) irregular heartbeat. It is used to restore normal heart rhythm and maintain a regular, steady heartbeat. Sybil suffers from atrial fibrillation (a-fib). She has had health scares in the past due to heart irregularity. It is critical that she timely receive this medication, in two daily doses – a morning and evening dose.[97]

118. On Friday, September 4, 2020, Sybil did not timely receive her morning or evening Rythmol medication. Again, Sybil was informed that the facility was out of Rythmol. As Sonya had started to do nearly every month, she complained to the facility that they were again out of her mother's necessary heart medication. Her mother failed to receive Rythmol, either the morning or evening dose. On Saturday, September 5, 2020, her mother failed to receive Rythmol, either the morning or evening dose.[98]

119. On September 6, 2020, Sybil failed to receive Rythmol in the morning. Sonya complained. Cynthia from "corporate" said the medication would be arriving that day. Sybil informed Sonya that this had been happening nearly every month.[99]

120. On September 10, 2020, Sybil informed Sonya that not all the employees were wearing gowns. Sonya was further informed that her mother did not receive her nighttime medications until 1:40 a.m.[100]

---

[96] Sonya Hooker new affidavit ¶ 7.
[97] *Id*. at ¶ 8.
[98] *Id*. at ¶¶ 9-11.
[99] *Id*. at ¶ 12.
[100] *Id*. at ¶ 14.

121. During the later evening of September 14 / early morning hours of September 15, another resident came into Sybil's room, shut the door, and went to the bathroom. Sybil put her call light on. The resident came out and Sybil talked her into leaving the room. No one answered the call light. Sybil decided to sit up and watch television since she was awake at that point. She went to raise the head of her bed and it suddenly dropped all the way down. It scared her because she thought she was going to hit the floor. She cannot lie flat so she started panicking (since no one had answered the call light yet). She tried to reach her phone and dropped it. She started to feel like she was going to have a panic attack. Someone finally answered the call light after 30 minutes of her waiting.[101]

122. On September 17, 2020, a CNA told Sybil that the filtered water dispenser in the ice machine was broken so she could not get Sybil water. The next day, Shawn, a CNA, told Sybil that the dispenser was not broken. On September 19, 2020, lunch consisted of one chicken tender, a scoop of coleslaw, and one piece of hard white bread. Sybil has consistently noted the poor quantity and quality of the food.[102]

123. On September 21, 2020, when medications were delivered, Sybil was again missing her Rythmol pill and one pain pill. She was again told they were out of her Rythmol. After she complained, she was provided one pain pill which she was informed had been "borrowed" from another resident. But they could not get her the Rythmol.[103]

---

[101] Sonya Hooker new affidavit ¶ 15.
[102] *Id*. at ¶¶ 16-17.
[103] *Id*. at ¶ 18.

124.    On September 22, 2020, Rythmol had supposedly arrived; however, the night nurse advised Sybil that it still was not in.   On September 23, 2020, the morning nurse brought Sybil the medication and informed her that it had arrived the night before, but they could not find her card containing the medication.   On September 24, 2020, the 2nd shift CNA helped pull Sybil back into her bed around 5:00 pm. Sybil then turned her call light on at 10:00 pm. It was on for over an hour and no one came. When third shift came in at 11:00 pm, they finally answered the light. Sybil never saw the second shift CNA after 5:00 pm (3:00 pm to 11:00 pm shift).[104]

125.    Problems secondary to understaffing and poor management continued after September 2020.  As an update, shortly before the date this complaint was filed, on Friday, May 14, 2021, Sybil reported that despite all of the prior complaints, the prior deficiency findings by the state, and repeated efforts to obtain her important medications timely, she had not been given her heart medications for the last two days, and she was unsure if it she would have it that evening.   This medication is extremely important to control her atrial fibrillation. Similarly, she stated that the previous week she was not given another medication because it was also not available.   These recurrent gaps and lacks in medication cause her severe emotional distress.

126.    On Friday, May 14, 2021, Sybil Rummage was not provided her requested breakfast.  She does not eat lunch and has a standing order for breakfast which is to include two pieces of toast, two slices of bacon, and two fried eggs.  On Friday morning, she was

---

[104] Sonya Hooker new affidavit ¶¶ 19-21.

given one piece of toast, no bacon, two tablespoons of powdered eggs, and one very small bowl of grits, which she does not eat because of diet restrictions.

127.   On Friday, May 14, 2021, Syble Rummage stated that to her knowledge, the understaffing has continued, with the 200 hall having only two CNAs at most which is not sufficient with a unit of residents who are dependent upon others to care for them.

128.   As of May 2021, Ms. Rummage confirmed that her daughter, Plaintiff Sonya Hooker, has continued to provide to her the supplies that she needs because of the failure of the facility to provide necessary and quality supplies.  Sonya provides her with pads for her bedding, additional bedding, diapers, and other items necessary to keep her bed dry and to reduce the amount of staffing that will be necessary to change her. Unfortunately, her roommate and others do not have these privately provided items and the inadequate staffing which she continues to witness, necessitates their having to be changed more and to lie in their own urine and feces for unreasonable periods of time.

129.   The survey results reflecting when the state inspectors have come and investigated the facility corroborate Sybil Rummage and Sonya Hooker's statements regarding improperly managed medications.  From the September 1, 2020 survey:

   a. Page 56:  Failure to provide adequate medications:  "Based on record review, staff and resident interviews, Pharmacist, Nurse Practitioner, and Physician interviews the facility failed to acquire and administer potassium chloride for a resident, that received diuretic medication; and failed to acquire and administer diuretic and heart medication for a resident with atrial fibrillation and congestive heart failure for 2 of 7 residents reviewed for medication administration (Resident #1 and Resident #14)."  On information and belief, Resident #14 is Sybil Rummage.

   b. Page 64:  Additional medication errors, either reflecting inadequate medication supplies, inadequate staff training and support, or both: "Based

on record reviews, observations, staff interviews, Pharmacist, Nurse Practitioner and Physician interviews the facility failed to administer medications to 3 of 7 residents, Resident #1, Resident #14, and #18, reviewed for medications not given according to physician's orders. Resident #1 did not receive doses of Potassium Chloride, which was given as a supplement to prevent decreased potassium levels because the resident received a diuretic; Resident #14 did not receive doses of a diuretic and a heart medication; and Resident #18 did not receive Parkinson's Medication (Carbidopa/Levodopa) within the administration times ordered by the Neurologist."

c. Page 66: "Nurse #1 stated there were several medications that were not available for different residents when she worked at the facility."

d. Page 69: "Nurse #7 stated she did remember the facility did have missing medications and she had to call the pharmacy frequently."

e. At page 71 the medication problems are tied to understaffing: "During an interview with the Director of Nursing on 7/29/2020 at 12:15 pm she stated she was not made aware Resident #18 had not received her Parkinson's Disease medication within one hour of the set administration time. She stated the facility had recently divided the 200 Hall into two assignments due to the nurses not being able to complete their medication administration passes within a reasonable time. The Director of Nursing stated the physician should be notified by the nurse when a medication is not given according to the physician's order. During an interview on 7/30/2020 at 10:23 am with Nurse #6 revealed she worked at the facility on 5/24/2020 and she stated she had given Resident #18 her Parkinson's Medication late. Nurse #6 stated there were so many residents on that unit it was impossible for the nurse to give the medications on time."

f. Likewise at page 72: "Nurse #11 was interviewed on 7/30/2020 at 11:08 am she stated she had cared for Resident #18 on several evening shifts in July and she had not given her Parkinson's Disease medication within one hour of the medication being due. Nurse #11 stated the assignment consisted of almost to many residents and it was impossible to give Resident #18's medication within one hour of it being due. During an interview with Nurse #1 on 7/30/2020 at 11:21 am she stated she had worked on 7/8/2020 and was late giving Resident #18 her medications. Nurse #1 stated there were so many residents on the assignment she was not able to give the Parkinson's Disease medication within one hour of the time it was due."

45

130.    The facts from Sybil Rummage and Sonya Hooker reflect that the facility has serious operational issues as it relates to resident care and staffing including failures:

- to provide critical medications to residents in a timely manner;
- to timely ensure residents' regular medications are ordered to arrive to the facility on a scheduled and as needed basis;
- to have an effective system in place that tracks when medications are received at the facility for residents;
- to track residents' medication cards;
- to provide food, water, and nourishment to residents that are of acceptable quality and quantity;
- to respond to the needs of residents in a timely manner; and
- to wear personal protective equipment that adequately protects residents and staff.[105]

## C.    Facts regarding the Deal family.

131.    Donna Deal and her husband Mike reside in China Grove.  Betty Deal is a resident of The Citadel.  Betty is Mike's mother and Donna's mother-in-law.  Betty was born on June 8, 1930.  Prior to residing at The Citadel, Betty resided with Mike and Donna. Betty's husband had died in 2017.[106]

132.    Before being admitted, Betty suffered progressively worse symptoms from Parkinson's disease.  She stayed cognitively stable but had issues with mobility and motor skills and required a strict prescription medication regimen.  She had a series of falls, including one in which she broke her arm and had to go to the hospital.  The family then agreed that Betty would go stay at the Genesis facility in Salisbury for rehabilitation.

133.    Betty began residing at the Genesis nursing home, now known as The Citadel, in April 2019.  The family signed admission documents on April 9, 2019.

---

[105] Sonya Hooker new affidavit ¶ 22.
[106] Donna Deal Affidavit.

134. Before placing Betty with the Genesis facility, which was then known as the Salisbury Center, Donna and Mike examined their options. They were assured that it was a good facility. Meanwhile, other facilities did not have available openings.

135. The level of service provided by Genesis was not perfect. However, the level of service drastically declined after the facility was sold by Genesis and the new owners took over operations on February 1, 2020.

136. Plaintiffs did not learn of the ownership change until January or February 2020 when they heard about it from staff. They also believe they received a copy of the form letter authored by Accordius executive Kim Morrow dated February 1, 2020 promising "5-Star" service.

137. Defendants failed to provide the statutorily required disclosures or contract agreement to Betty Deal or her sponsors at the time they took over the facility, and further intentionally concealed and failed to disclose the actual nature of the Defendants' chronically understaffed and low-quality business model, already established in others of its North Carolina facilities.

138. If Defendants had properly and accurately made their statutory disclosures and otherwise disclosed the true facts when they took over the facility, then Plaintiffs would have sought to obtain state intervention, sought relocation, or taken other action in an effort to protect Betty and other residents.

139. After the new owners, consisting of the Defendants herein, took over, Donna and Mike began to have serious concerns that residents at The Citadel, starting with Betty, were being neglected to such a serious degree that their health and life were in danger.

140.    Further, Plaintiffs began to ascertain that the administrators and managers of the facility were being deceptive, deflective, and dishonest to those who expressed concerns about resident loved ones' ongoing wellness and safety.  Further, The Citadel was forging or improperly completing medication charting to reflect that medications had been given to the resident when they had not.

141.    During the year 2020, Betty had been prescribed the following medication regimen by her treating physician to treat and lessen symptoms caused by her Parkinson's disease:[107]

| 6:00 am | 1 pill |
| 9:00 am | 2 pills |
| 12:00 pm | 2 pills |
| 5:00 pm | 2 pills |

142.    This medication was important to timely and properly administer in order to control Betty's serious illness and maintain her quality of life.  As Donna Deal has testified, the "medication is important…. Sometimes she can't speak without her medication being given in a timely manner…."[108]

143.    After the Citadel took over operations in February 2020, Betty began to not receive her required medications in the required amounts at the required times.

_____

[107] Donna subsequently memorialized her notations and personal knowledge in a sworn statement dated Sept. 28, 2020.  When the facility's medical director, Dr. Yut, was shown her sworn statement at his deposition, he testified that he did not doubt the veracity of it. Dr. Yuthapong Sukkasem depo. dated Jan. 11, 2021, 196:2-7 and depo. ex. 11.
[108] Donna Deal depo. 20:9-18.  "So she needed that medication to be able to walk and function.  She is more apt to have falls if she didn't have her medication on a timely manner.  She wouldn't be able to speak clearly at times if she didn't have her medication on a timely manner."  *Id*. at 25:18-24.

144.    Donna began to keep notes of the failures to provide medications by the nursing home's new ownership.  Betty herself was often aware of when she did not receive her medications.   Donna's notes reflected that The Citadel failed to provide Betty's Parkinson's disease medications timely on the following dates and times starting in early February prior to there being any COVID pandemic issues:

February 7, 2020, 12:00 pm
February 7, 2020, 5:00 pm
February 7, 2020, 9:00 pm
February 8, 2020, 6:00 am (first medicine dose received 20 hours after when due)

145.    This situation was dangerous to Betty.

146.    During the nursing staff 1st shift on Saturday, February 8, 2020, it was discovered that there was no medical chart in the medical/nurse's book for Betty.

147.    During the transition of the software systems from Genesis (old owner) to The Citadel (new one), The Citadel relied on written medical notebooks to keep up with medication schedules, rather than a digital or electronic chart. This was a cost-cutting measure by the new owners.  On information and belief, one of their corporate policies whenever they take over a new nursing home is to abandon and cut off all existing vendors, contracts, and services wherever they believe it will save money.  The new owners then try to renegotiate contracts, bring in their own preferred vendors, or have the staff do without.

148.    On February 8, 2020, the direct care nurse discovered that Betty's written medication chart was missing.  At this point, Betty had gone 20 hours with no medicine or breathing treatments.  She was a high-quality nurse who was so frustrated by how poor the new owners ran the facility, that she quit after working at the facility for over 20 years.

49

149.    Defendants' corporate mismanagement that led to the records failures rises to the level of spoliation of evidence under North Carolina law.

150.    On February 8, 2020, Donna asked the facility for the state complaint hotline number.   They were closed on Saturday and so she called the police department and reported the neglect.  However, the failures to provide medications to Betty continued:

February 11, 2020, 6:00 am
February 11, 2020, 12:00 pm
February 12, 2020, 6:00 am
February 13, 2020, 9:00 am
February 13, 2020, 12:00 pm

151.    On February 13, 2020, a facility worker wrote up a concern report.  However, despite this, the failures continued.

152.    On February 17, 2020, Donna received a text from the facility indicating they had confused Betty's medications and potentially doubled them.  Donna was told to call Patricia Cowan, a Patient Advocate.  On the same day, Donna had a discussion with the new facility administrator brought in by the new owners, Sherri Stoltzfus.  Donna spoke with Ms. Stoltzfus about the family's constant issues with medications since The Citadel assumed ownership.   However, the serious medication errors continued:

February 28, 2020, 9:00 (received at 11:45 am, two hours and 45 minutes late, assuming the documentation is accurate)
May 22, 2020, 9:00 am (received at 11:30 am)
May 24, 2020, 9:00 am (received at 11:45 am)
May 24, 2020, 12:00 pm (received at 2:30 pm)
May 24, 2020, 9:00 pm (received at 12:00 am)
May 25, 2020, 12:00 pm (still not received at 4:36 am)
June 19, 2020, 6:00 am
June 24, 2020, 9:00 pm (received at 11:45 pm)
June 26, 2020, 6:00 am (the facility claims per its charting that it gave at 6:45 am)
June 26, 2020, 9:00 am

June 29, 2020, 9:00 am (received at 11:30 am)

153.     On June 29, 2020, Donna texted Sherri Stoltzfus to call her.  By July 1, 2020,

she had not replied.  Meanwhile:

July 6, 2020, 9:00 am (not received until 11:50 am)
July 6, 2020, 12:00 pm (not received until 3:15 pm)
July 6, 2020, 5:00 pm
July 6, 2020, 9:00 pm
July 7, 2020 – on this day, Betty fell.

154.     On July 7, 2020, the Director of Nursing arbitrarily changed Betty's

medication schedule to the following:

| Old: | 6:00 am | 1 pill |
|------|---------|--------|
|      | 9:00 am | 2 pills |
|      | 12:00 pm | 2 pills |
|      | 5:00 pm | 2 pills |

| New: | 6:00 am |
|------|---------|
|      | 10:00 am |
|      | 1:00 pm |
|      | 5:00 pm |
|      | 9:00 pm |

155.     Plaintiffs' information on what followed reflected:

July 10, 2020, 1:00 pm (not received until 2:45 pm)
July 31, 2020, 12:00 pm (not received until 2:45 pm)
August 1, 2020, 6:00 am
August 1, 2020, 12:00 pm (not received until 2:30 pm)
August 2, 2020, 6:00 am (not received until 12:35 pm)
August 2, 2020, 9:00 am (not received until 12:35 pm)
August 2, 2020, 5:00 pm (not received until 7:35 pm)
August 11, 2020, 6:00 am
August 13, 2020, 9:00 pm (received at 12:00 am)
August 14, 2020, 9:00 am (received at 11:00 am)
August 19, 2020, 6:00 am
August 19, 2020, 9:00 am
September 19, 2020, 6:00 am (received at 11:45 am)
September 19, 2020, 9:00 am (received at 11:45 am)

156.    For September 27, 2020, a medicine dose was due at 9:00 pm for Betty. However, Betty at that time did not receive it.  The Citadel's charting system stated her medications were received at 12 midnight.  However, per discussions with Betty and her roommate, Plaintiffs believe the charting to be false in this regard.

157.    On August 2, 2020, Donna was told when she called to complain that there was only one CNA in the entire building.

158.    During this time, Defendants had the financial resources to ensure better staffing at the building.  Staffing a nursing home is a matter of cost.  Unsurprisingly, if the ownership agrees to pay more for staff, it is easier to find qualified staff.  Staff can include both full-time staff employed by and receiving a paycheck from one or more of the Defendants, and staff who are employed by an outside agency or are self-employed and are brought in and paid by Defendants as contract workers.

159.    However, part of Defendants' for-profit private-equity business model was to cut costs and reduce staff to minimum numbers.  This business model, which was negligent, reckless, and intentional, was unrelated to the COVID-19 issues which began to manifest at the facility in March-April 2020.

160.    Defendants including particularly Portopiccolo, Hyman and Zanziper knew from their past experience with other nursing homes in their chain the effects of their business model.  Staff would leave because the new ownership would cut their benefits they had accrued over the course of their work with the prior employer at the facility.  Staff would leave because they were overworked, often working additional shifts and in

positions that they were not often qualified to handle, and yet, their pay would not increase consistent with their efforts. Staff would also leave because of the rudeness of the owners and the loss of key middle-management structures, programs, outside vendors and support systems that existed under the old owners but were abandoned with the new ones.

161.    Because of the continued neglect of their mother-in-law with regard to her medications, Donna Deal complained to staff, director of nursing, and administrator. Donna complained to the state and the local police. Donna and Mike were constantly upset and worried about whether Betty was receiving proper medications and care. It was not fair to Betty or to her caretaking family that they could not rely upon the facility to properly administer Betty's required medications to treat her Parkinson's disease.

162.    If Defendants had been truthful, fair and accurate in their disclosures and promises that they made to the Plaintiffs prior to when the Plaintiffs elected to allow the facility to continue to care for Betty after the new owners took over, the Plaintiffs would have refused to allow Defendants to care for Betty and would have used all available options to find an alternative method of having Betty cared for, and would have made complaints earlier and sought to take other action.

163.    Following one investigation by the state, the investigator called Donna to advise her that the state regulators had checked the medication chart made available to them to review at the facility by the owners, and it was indicated that Betty had received her medications at one or more of the dates and times listed above. Plaintiffs are informed and believe and therefore allege that the information found in the chart in that regard in one or more instances is not true. Plaintiffs so allege based on their personal knowledge,

the facts ascertained from Betty and other staff or witnesses, and from other facts learned from the investigation herein.

164. When Donna tried to get to the bottom of whether or not the medications were given or to understand why they were not timely given at any particular time, she was given numerous excuses by the management. On one occasion, they said that Betty's roommate had observed Betty being given her medications and that Betty must have been mistaken in saying she had not received them. The roommate denied giving any such confirmation.

165. In addition to medication neglect, The Citadel also failed to give Betty timely baths and showers. Good quality bathing with competent caring staff is a key part of the quality of life for a patient in a nursing home. That was inadequate here.

166. For example, Donna requested a bath for Betty from the facility on August 14, 2020. She called to report that no morning bath had been given. It was promised that Betty would be bathed that evening. On August 15, 2020, she again had received no bath. Donna was again promised that Betty would have one by 7:00 pm. Again, Betty did not receive a bath. Donna called and was again promised that Betty would have one on Sunday, the next day, at 7:00 am. Sunday morning came and Betty was up and ready for her bath. But the staff did not bathe her until around 11:00 am that day.

167. When Citadel took over, the quality of supplies declined. For example, the management changed the type of adult diapers that they sourced and used. The new adult diapers were not as good as the ones before. The family began purchasing undergarments

for Betty out-of-pocket given the quality drop-off.  The Plaintiffs allege a right to compensatory damages for any and all out-of-pocket expenditures in this regard.

168.    In August 2020, Betty told the Plaintiffs that she had lost one of her hearing aids.  The hearing aids are important to her quality of life.

169.    Plaintiffs had a new hearing aid fabricated and mailed to the facility.  In early September, Betty called to ask about the status of her aid, which she still did not have.

170.    Donna and Mike were perplexed.  The device should have made it to Betty by that time.  They began to investigate.  Donna confirmed with the hearing aid company that it had been shipped on August 17 and had arrived at the facility on August 18, 2020.

171.    Donna confirmed from the hearing aid company that their agent had called The Citadel Salisbury to ask how the hearing aid had worked out and to ask if there were any problems, and the person there indicated there were no problems with it.  And yet, Betty actually had not been provided the hearing aid by the facility by that time.

172.    On September 8, 2020, Mike called the facility to ask why his mother had not received the hearing aid.  He spoke to staff and complained.  Only after this complaint call was made did Betty finally receive her hearing aid.

173.    The Plaintiffs were eventually advised that the hearing aid had been on the nurse cart from August 18, 2020 through September 8, 2020.  However, it took the repeated efforts and the complaint from the Plaintiffs to get the device to their loved one.

174.    The quality of the food and food service as well as beverages and condiments for Betty has been awful.  The food has been grossly inadequate, and it has caused Donna

and Mike additional distress that Betty has been given poor-quality food, cold, late, and with condiments lacking.

175. Betty was one of the residents that tested positive for COVID-19 in the early part of April 2020. Donna learned of COVID outbreak from other residents and resident sponsors, days before she was informed by the facility. Betty was considered high-risk due to pre-existing COPD (unrelated to smoking as she was a non-smoker).

176. The facility medical director, Yuthapong Sukkasem, MD, known to all by his nickname, Dr. Yut, advised Donna that Betty had been tested for the virus, along with many others, on April 9 or 10, 2020. The testing was conducted at the insistence of the local hospital officials and the health department's initiative using the state lab as the facility owners had taken no affirmative steps to initiate testing despite knowing of the high fevers and other COVID symptoms being experienced by the residents.

177. On or about April 13, 2020, Donna called the Director of Nursing to ask for Betty's COVID-19 result. Donna was not given it. Donna spoke with the Director of Nursing and told her that Donna heard that several staff had contracted the virus. The response was to the effect of, "Who said that?" Donna and Mike later learned that the facility had known of numerous positive COVID-19 results by this date.

178. On April 14, 2020, Donna texted a facility staff member that Donna and Mike were very unhappy with trying to get information. People were not returning phone calls and it was impossible to get information.

179.    By April 15, 2020, Donna texted a facility social worker at 1:31 pm to ask if Betty had COVID-19.  Belatedly, at 5:00 pm, the facility acknowledged to Plaintiffs that Betty had a positive result.

180.    Following her positive COVID result, Betty advised that very few of the residents as far as she could discern were provided a shower for a month-long period.

181.    The facts as described and alleged herein by Donna Deal and her husband, as well as those alleged and averred by other similarly situated caretakers of residents and/or residents themselves, reflect that during the pertinent times since its takeover of the facility, and continuing through today, Defendants have exploited and neglected residents at The Citadel who are not of sound mind and competence and who are unaware that they are not receiving proper medications, showers and baths or needed medical attention.

182.    Since the new owners took over, one or more personal items or items of clothing for Betty have disappeared.

183.    The facility has gone for months without a hair stylist.  Finally, Donna communicated with the management and requested that they please hire a stylist, as the old owners used to have one.  The management suggested that if Donna wanted a stylist to work there, she should find someone who could do hair styling and recommend the name.  Donna did so but ever since then, nothing has changed.

184.    Betty Deal continued receiving inadequate care due to lack of staffing, medications and supplies, in the months that followed.  Most recently, on May 14, 2021, Mike and Donna went to The Citadel to visit Betty at around 3 pm.  Betty advised that she had not received her 12 noon medications.

57

185.   After their visit, at about 3:20 pm, while taking Betty back to her room, Donna asked the nurse at the nurse's station to check her medications.  Donna told her that Betty told them that she did not receive her 12 noon meds.  The staff person, who was a med tech, turned to another worker at the computer and told us that she (the one at the computer) gave Betty the medications.  The person at the computer, however, said she did not, and that the med tech we were asking was the one who gave them.  At that point the med tech said well, she was sure they were given because there was not a red flag on the computer indicating they were not given.

186.   Donna and Mike took Betty back to her room and asked again if she was sure she did not get her medications at 12 noon and she said, yes, she was sure.

187.   Donna went back to the nurse's station to the med tech and asked if she could tell Donna what time the medications were given.  The med tech said no, it did not show a time, just that the medications were given.

188.   As Donna and Mike were walking out to leave the facility, they ran into another staff member, Doris, in the foyer, and asked her to look into it and call them back.

189.   At 4 pm, Donna received a call back from Doris.  Doris said the records showed that at 1:27 pm the 12 pm medications were given (i.e., they were given 1 ½ hours past her due time for her Parkinson's medications).

**D.    The Citadel Website.**

190.   Defendants have made and continue to make unfair and deceptive representations regarding the nature of services and care at the Citadel Salisbury.  One of their websites reviewed on April 16, 2021 represented in part as follows:

**WHO WE ARE**

A 180-bed skilled nursing facility located in the rural setting of Salisbury, North Carolina, The Citadel Salisbury is a warm and intimate center celebrating 32 years of passionate — and compassionate — care. We offer exceptional short and long-term care, with a team of full-time therapists who specialize in rehabilitation.

191.    This is misleading.  The Citadel Salisbury has only held the facility license since February 2020 – about 15 months.  Before it was the Citadel Salisbury, the facility was owned by the Genesis chain, and before that, by other owners.  Nursing home chains and owners are not all identical.  By trying to posture the facility as being in place for 32 years, Portopiccolo tries to give it a misleading aura of permanence.

192.    Likewise, the representation that the facility offices "exceptional" care is false.  The Nursing Home Compare rating of the facility is currently no stars at all – on the Special Focus list reserved for the very worst facilities.

193.    Finally, the "team of full-time therapists" actually consists of a revolving cast of contract workers.  The website also provides:

59




194.    These photos are stock photos that are not from the Citadel.  Further, the residents and their sponsors have complained of lacking the amenities that are advertised.

195.    Numerous residents and staff alike have described the food service at the Citadel as being atrocious.  The menu is limited, the food is often late, or cold, or both, the kitchen area is decrepit, and the understaffing causes failures in service. See Jan. 31, 2020 state survey, pp. 21 (describing resident complaints if being brought wrong food), 22 (same), 24 (dishwasher failed to reach correct temperature), 28 (large staff turnover in kitchen); Sept. 1, 2020 survey, pp. 75 (describing "dietary concerns residents had expressed regarding cold foods and condiments"), 76 (food cold), 79 (bananas were observed with dark spots throughout), 80 ("The perimeter of the kitchen floor was noted with dark colored debris, food particles, and paper," "The three ovens were noted with a thick black debris buildup and the oil in the deep fryer was dark/discolored," "The lower shelves and legs of the cook's prep stations were noted with dark debris buildup," "The conveyor belt of the tray line was noted with dried food debris and dark colored buildup," "Multiple broken floor tiles were noted along the perimeter of the wall and in the dish machine area," "Three

60

floor tiles were concaved in the dish machine area," "Approximately 2-inch hole was noted in the wall next to the power switch for dish machine"), 81 (more facts showing decrepit, dirty kitchen area), 99 ("Pest activity was noted on multiple plastic meal trays that were stored on the conveyor belt of the tray line. Pests were observed crawling on the plastic meal trays."). The Citadel took over operations knowing of these deficiencies and failed to correct them but rather made them worse.

196.    The resident and sponsor affidavits aver to terrible food; food served late, cold, inedible; failure to follow dietary restrictions for residents; lack of condiments; lack of service; and a roach-infested decrepit kitchen.[109]

197.    The law states that residents are entitled to quality, palatable food.[110]

---

[109] *See* Sonya Hooker Corr. Aff. July 23, 2020 ¶ 14; Scott Eagle Aff. July 10, 2020 ¶¶ 7-8; Mary Scudillo Aff. July 8, 2020 ¶ 8(b); Kari Alquist Aff. July 9, 2020 ¶ 11; Theresa Fitzgerald Aff. July 10, 2020 ¶ 20.

[110] 42 C.F.R. § 483.24 ("Quality of life is a fundamental principle that applies to all care and services provided to facility residents. Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care."); § 483.24(a) ("Based on the comprehensive assessment of a resident and consistent with the resident's needs and choices, the facility must provide … good nutrition…."); § 483.24(b) ("The facility must provide care and services in accordance with paragraph (a) of this section for the following activities of daily living: …  (4) Dining - eating, including meals and snacks…."); § 483.60 ("The facility must provide each resident with a nourishing, palatable, well-balanced diet that meets his or her daily nutritional and special dietary needs, taking into consideration the preferences of each resident."); § 483.60(d) (must ensure "[e]ach resident receives and the facility provides -- (1) Food prepared by methods that conserve nutritive value, flavor, and appearance; (2) Food and drink that is palatable, attractive, and at a safe and appetizing temperature; (3) Food prepared in a form designed to meet individual needs; (4) Food that accommodates resident allergies, intolerances, and preferences…."); § 483.10(e)(3) (resident has "right to reside and receive services in the facility with reasonable accommodation of resident needs and preferences").

198.    Defendants misleadingly advertise the facility as follows regarding its food:



## Laughter is loudest where food is best.

**DINING AT ACCORDIUS**

**THE FLAVORS YOU LOVE.**

Is there anything more beloved than Mom's cooking, or local cuisine that transports you back in time? Our menu directly reflects our geographic location, featuring fresh, flavorful food. Every meal features two enticing entree options to ensure that you get the food you love.

**HEALTHY + WHOLESOME = HAPPY.**

Your health is important. That's why a dedicated dietary manager and a dietician collaborate to develop nutritious meals that make your heart (and taste buds!) smile. You can expect your body to thank you — every day of the year. And for our traditional holiday feasts, we invite your family to join you at the table!

**A MENU THAT'S ABOUT YOU.**

Want something you don't see? Let us know! There is no rigid menu here. We work with our residents to create unique, facility-specific menus that consistently delight palates, with special attention to individual preferences.

199.    These representations were and are unfair and deceptive.  As a direct and proximate result of Defendants' business model, the food was poor, the amenities were lacking, the staffing was poor, and the supplies were lacking or low-quality.  This is a photo of what the food actually looks like at the Citadel:



## V.    CLASS ACTION ALLEGATIONS

200.    Pursuant to LR 23.1 and Fed. R. Civ. P. 23, Plaintiff requests the Court adopt the following class definition: "All individuals who have been residents, or sponsors of residents, at the Citadel Salisbury facility from February 1, 2020 until present."

201.    <u>Numerosity</u>:  The class is composed of hundreds of persons geographically dispersed, the joinder of whom in one action is impractical. The class is ascertainable and identifiable from Defendants' records and documents.

202.    <u>Commonality</u>:  Questions of law and fact common to the class exist as to all members of the class and predominate over any questions affecting only individual members of the class. These common issues include, but are not limited to:

    a.    Whether Defendants have used uniform policies and systems for purposes of managing staffing, supplies and services at the Citadel Salisbury with regard to the Plaintiffs and the class members over the pertinent times;

63

b. Whether those uniform policies and systems have been inadequate to carry out the facilities' basic common-law and statutory duties and ensure proper management, services and supplies;

c. Whether Defendants have caused systemic understaffing of the facility;

d. Whether Defendants have published, provided and made statements and representations with regard to the nature of their management, services and supplies at facilities like the Citadel Salisbury which are unfair and deceptive within the meaning of NC UDAP;

e. Whether Defendants outside of the North Carolina skilled nursing facility license holding entity, The Citadel Salisbury LLC, have directly and actively participated in owning, operating and managing the Salisbury facility so as to render them jointly and severally liable;

f. Whether the law requires the facility to maintain staffing at a reasonable across-the-board level;

g. Whether the figure of 4.1 hours per resident day ("hprd") of total nurse staffing, and 0.75 hprd of Registered Nurse staffing, reflect the standard of reasonability which this facility must meet, or whether the facility otherwise failed to meet reasonable staffing requirements;

h. Whether the understaffing caused harm to facility residents;

i. Whether the facility was obligated to provide a written contractual agreement for the residents and their sponsors on February 1, 2020 for carryover residents, and at the time of admission for later-admitted residents;

j. Whether the facility was obligated to provide statutorily required written disclosures to residents and their sponsors on February 1, 2020 for carryover residents, and at the time of admission for later-admitted residents;

k. Whether Defendants' practice of not providing contracts and written disclosures was unfair or deceptive.

l. Whether an express or implied-in-fact contract was formed between residents and the facility on February 1, 2020 for carryover residents, and at the time of admission for later-admitted residents;

m. Whether one or more of the Defendants breached contractual duties to the Plaintiffs and class members;

64

n. Whether Defendants' breach of contract caused damage to the Plaintiffs; and

o. Whether the Plaintiffs and the class members are entitled to an award of compensatory damages or other relief.

203. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the other class members. Plaintiffs and the other class members have been injured by the same wrongful practices. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories.

204. <u>Adequate Representation</u>: Plaintiffs will fully and adequately assert and protect the interests of the other class members. In addition, Plaintiffs have retained class counsel who are experienced and qualified in prosecuting class action cases. Neither Plaintiffs nor their attorneys have any interests conflicting with class members' interests.

205. <u>Predominance and Superiority</u>: This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the class is impracticable. Should individuals be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

206.   <u>Issue class</u>:  In the alternative, a class should properly be certified with regard to one or more material issues of fact or law herein pursuant to Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

## CLAIMS FOR RELIEF

## COUNT ONE – BREACH OF CONTRACT

207.   All above-alleged paragraphs are incorporated by reference.

208.    This claim is brought individually by Plaintiffs Sybil Rummage and Betty Deal and on behalf of a class of those similarly situated.  The claim is brought against the Citadel Salisbury LLC as a contracting party, and against the remaining Defendants based on principles of civil conspiracy, concert of action, and piercing the corporate veil.

209.   During the pertinent times, The Citadel Salisbury LLC had express or implied-in-fact contracts with each of its residents including Plaintiffs.

210.   During the pertinent times, The Citadel Salisbury LLC breached its contracts with the Plaintiffs.

211.   As a direct and proximate result of Defendant's breaches of contract, the Plaintiffs were damaged.

212.   As a systemic matter and on a class-wide basis, the Citadel Salisbury Facility has been chronically understaffed during the pertinent times, thereby breaching the express or implied terms of its resident contract.

213.   When families place their elders and other loved ones at a skilled nursing facility, they either contract to pay for the care by their own private funds (aka, private pay

customers), or, pay via assignment of their rights to payment sources such as Social Security funds, retirement pension funds, Medicare, or Medicaid benefits, to the facility.

214. In return for their contractual agreement to either privately pay the Facility or to assign their rights and benefits from other payment sources to the Facility, such as for the Facility to obtain Medicaid payments for its care provided to the residents, said residents and their family members and sponsors are entitled to rely on the corresponding promise and agreement by the Facility to provide care, staffing, service and supplies that abide by relevant rules, laws and standards.

215. Plaintiffs did not receive what they were entitled to by way of performance of the contractual duties and obligations of the Defendant in return for their own contractual agreement, promises and commitments to the Defendant. The families did not get the benefit of their bargain. Rather, while the Citadel Salisbury was fully paid either by families directly or from assigned payors like Medicaid on the families' behalf, the Facility did not provide the service or supplies and the level of staffing that it was obligated to supply to the resident population.

216. Plaintiffs and class members were damaged by Defendant's breach of contract. Plaintiffs have satisfied any applicable conditions precedent to suit.

217. The Plaintiffs and class members are entitled to damages in an amount reflecting the amount of private payments made by them to The Citadel; and/or, the amount of payments made by Medicare, Medicaid or other payor sources on their behalf.

218. Alternatively, Plaintiffs are entitled to damages as measured by the reasonable value of the staffing hours that were not provided but that should have been

provided.  In return for assigning their Medicare, Medicaid, insurance, social security, and personal private funds, to the Defendant, Plaintiffs and class members were contractually entitled to receive services and supplies meeting federal and state skilled nursing standards. However, they did not.  Accordingly, they are entitled to payment of damages representing the difference between the value of the services and supplies they actually received, subtracted from the value of the services and supplies to which they were reasonably entitled under the contract.

219.    In addition, Plaintiffs are entitled to damages for all unnecessary out-of-pocket expenses they have incurred.

220.    The non-Citadel Defendants are jointly and severally liable for the breach of contract due to their direct involvement, under principles of civil conspiracy and concert of action, and under the doctrine of piercing the corporate veil.

221.    Accordingly, the Defendants should be ordered to pay damages for breach of contract in an amount in excess of $75,000 for the named Plaintiffs and for the class.

## COUNT TWO:  UNFAIR AND DECEPTIVE TRADE PRACTICES

222.    All above-alleged paragraphs are incorporated by reference.

223.    This claim is brought individually by Plaintiffs Sybil Rummage and Betty Deal and on behalf of a class of those similarly situated.  The claim is brought against all Defendants based on principles of direct material involvement, civil conspiracy, concert of action, and piercing the corporate veil.

224.    Under Chapter 75, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared

68

unlawful."[111] Chapter 75 (aka NC UDAP) bars (1) unfair or deceptive acts or practices, or unfair methods of competition, (2) in or affecting commerce, (3) which proximately caused[112] actual injury to the Plaintiffs.[113]

225. "The Act does not . . . define an unfair or deceptive act, nor is any precise definition of the term possible."[114] The North Carolina Supreme Court has stated that "[a] party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position."[115] "A deceptive [trade] practice is one that possesses the tendency or capacity to mislead, or creates the likelihood of deception."[116] A practice is deceptive if it has the tendency to deceive, and unfair when it "offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."[117]

---

[111] N.C. Gen. Stat. § 75-1.1(a) (2007).

[112] The case law is mixed regarding whether actual reliance is a required element of a consumer claim in all circumstances. *See D C Custom Freight, LLC v. Tammy A. Ross & Assocs*., 848 S.E.2d 552, 561-62, 2020 N.C. App. LEXIS 639 (2020) (reviewing case law and concluding that "Plaintiff in this case must show reliance to succeed on its UDTP claim").

[113] *Furr v. Fonville Morisey Realty, Inc*., 130 N.C. App. 541, 551, 503 S.E.2d 401, 408 (1998) (quoting *Spartan Leasing v. Pollard,* 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991)), *disc. review improvidently allowed,* 351 N.C. 41, 519 S.E.2d 314 (1999).

[114] *Bernard v. Cent. Carolina Truck Sales, Inc*., 68 N.C. App. 228, 229-30, 314 S.E.2d 582, 584 (quotation marks and citation omitted), *disc. rev. denied*, 311 N.C. 751, 321 S.E.2d 126 (1984).

[115] *Johnson v. Phoenix Mut. Life Ins. Co*., 300 N.C. 247, 264, 266 S.E.2d 610, 622 (1980), *overruled in part on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc*., 323 N.C. 559, 374 S.E.2d 385 (1988).

[116] *Miller v. Rose,* 138 N.C. App. 582, 592, 532 S.E.2d 228, 235 (2000) (internal brackets, quotation marks, and citations omitted).

[117] *Gray v. North Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).

226.     During the pertinent times, Defendants engaged in one or more unfair or deceptive acts or practices, or unfair methods of competition, in or affecting commerce, which proximately caused actual injury to the Plaintiffs and to the class, thereby entitling Plaintiffs and the class to damages in excess of $75,000.

227.     When the Citadel took over operation of the Facility on February 1, 2020, it did not ensure that complete copies of the documents required by N.C.G.S. § 131E-117(3) and § 131E-120(a) were in the resident files for the Plaintiffs or for class members.

228.     When the Citadel took over operation of the Facility on February 1, 2020, it violated N.C.G.S. § 131E-117(3) which provides that every patient has the right "[t]o receive at the time of admission and during the stay, a written statement of the services provided by the facility, including those required to be offered on an as-needed basis, and of related charges. Charges for services not covered under Medicare or Medicaid shall be specified. Upon receiving this statement, the patient shall sign a written receipt which must be on file in the facility and available for inspection[.]"

229.     When the Citadel took over operation of the Facility on February 1, 2020, it violated N.C.G.S. § 131E-120(a), which provides that: "A copy of G.S. 131E-115 through G.S. 131E-127 shall be posted conspicuously in a public place in all facilities. Copies of G.S. 131E-115 through G.S. 131E-127 shall be furnished to the patient upon admittance to the facility, to all patients currently residing in the facility, to the sponsoring agency, to a representative payee of the patient, or to any person designated in G.S. 131E-118, and to

70

the patient's next of kin, if requested.[118]  Receipts for the statement signed by these persons

shall be retained in the facility's files."

230.    In other words, when Citadel took over effective February 1, 2020, it had a

duty to either ensure full admission documents were in the patient chart carried over from

Genesis, if it planned to abide by those older documents and their provisions – or, it had a

duty to offer all-new admission agreement materials and obligatory statutory disclosures

and place them in the file for the resident.  However, it failed to do either.

231.    Defendants Accordius and Portopiccolo are jointly and severally liable with

the Citadel for the failure to provide appropriate agreements and disclosures as required by

statute do to those entities' direct material involvement in facility operations.

232.    Defendants' failure to provide required statutory agreements and disclosures

constituted an unfair and deceptive trade practice under N.C.G.S. 75-1.1, *et seq.* The breach

of a consumer disclosure statute may be a predicate to a UDAP claim.[119]

---

[118] We contend the "if requested" caveat only applies to next of kin who may so request.
This is consistent with how the Bill of Rights disclosure for adult care homes has been
construed.  *Compare* G.S. § 131D-24(a) ("A copy of the declaration of the residents'
rights shall be posted conspicuously in a public place in all facilities. A copy of the
declaration of residents' rights shall be furnished to the resident upon admittance to the
facility, to all residents currently residing in the facility, to a representative payee of the
resident, or to any person designated in G.S. 131D-22, and if requested to the resident's
responsible family member or guardian. Receipts for the declaration of rights signed by
these persons shall be retained in the facility's files. The declaration of rights shall be
included as part of the facility's admission policies and procedures."); *and see Bartels*,
Doc. 129 (defense brief admitting that "North Carolina law also requires facilities to
provide residents with a copy of the Adult Care Resident's Bill of Rights provided in the
North Carolina General Statutes. See N.C. Gen. Stat. § 131D-24.").

[119] *See Moretz v. Miller*, 126 N.C. App. 514, 517, 486 S.E.2d 85, 87, *rev. denied*, 347
N.C. 137, 492 S.E.2d 24 (1997) (noting that "the North Carolina Supreme Court has held
violation of a statutory provision designed to protect the consuming public may constitute

233.    Defendants furthermore engaged in unfair and deceptive trade practices including by misrepresenting the availability of medications and supplies to the Plaintiffs; by fraudulently recording inaccurate resident chart entries; by promising to effective communicate to Plaintiffs and failing to do so on matters of importance to the Plaintiffs concerning their loved ones; by implementing a business model of deficient staffing, supplies, medications and food at odds with their public pronouncements and assurances, and by other modalities as the evidence may show.

234.    As a direct and proximate result of Defendants' engagement in unfair and deceptive trade practices, the Plaintiffs and class members have been damaged in an amount in excess of $75,000.

---

an unfair and deceptive practice as a matter of law."); *Stanley v. Moore*, 339 N.C. 717, 724, 454 S.E.2d 225, 229 (1995) (violation of the Ejectment of Residential Tenants Act); *Pearce v. American Defender Life Ins. Co*., 316 N.C. 461, 470, 343 S.E.2d 174, 179 (1986) (violation of statute regulating insurance industry); *Winston Realty Co. v. G.H.G., Inc.,* 314 N.C. 90, 98-99, 331 S.E.2d 677, 682 (1985) (violation of statute regulating employment practices); *Edmisten v. Zim Chemical Co*., 45 N.C. App. 604, 607, 263 S.E.2d 849 (1980) ("We think, therefore, and so hold that defendant's misbranding of the antifreeze, which is undisputed, is a deceptive practice within the meaning of N.C.G.S. 75-1.1 as a matter of law."); *Alexander v. DaimlerChrysler Corp*., 2004 WL 179369, 2004 NCBC 2, ¶ 59, 2004 NCBC LEXIS 3  (N.C. Super. 2004) ("The failure to disclose information in connection with a consumer transaction that a state statute specifically designed to protect consumers' mandates is about a clear an unfair trade practice as can exist. The North Carolina Lemon Law evidences a clear and unmistakable public policy against lemon laundering. A manufacturer or reseller who takes title with notice of the nature of vehicle and the defects disclosed commits an unfair and deceptive trade practice when it resells the vehicle, either to a consumer or another wholesaler, without passing the notice along to the subsequent purchaser; such an act is both unfair and deceptive."); *Mills v. Hendrick Automotive Group,* No. 04 CVS 2301 (Union County Super. Ct. July 13, 2009), Order at ¶ 77 (same).

## COUNT THREE:  BREACH OF FIDUCIARY DUTY

235.    All above-alleged paragraphs are incorporated by reference.

236.    This claim is brought individually by Plaintiffs Sonya Hooker, Donna Deal and Mike Deal.

237.    A fiduciary is a person who is required to act honestly, in good faith and in the best interests of another person because a fiduciary relationship exists between them.[120]

238.    Under the circumstances, a fiduciary relationship arose between the Facility and the sponsor Plaintiffs Sonya Hooker, and Donna and Mike Deal, who entrusted the care of their loved ones into the hands of the Citadel and entrusted that the Facility would provide decent care and communicate prompt and accurate information regarding their loved ones and facility residents, Sybil Rummage (for Ms. Hooker) and Betty Deal (for Donna and Mike Deal).  The family sponsor Plaintiffs placed their loved ones into the hands of the facility based on assurances of the facility taking on a special relationship in which the family could repose their trust that the facility would care for their elders.[121]

239.    In trusting Defendants to care for their loved ones, the family sponsors provided to the facility and confided in the facility regarding the personal private situation and information of their loved ones.   The Plaintiffs placed a special confidence in

---

[120] *Hewitt v. Hewitt,* 252 N.C. App. 437, 442, 798 S.E.2d 796, 800 (2017) (citing *King v. Bryant*, 369 N.C. 451, 464, 795 S.E.2d 340, 349 (2017)); partners to a partnership, *id.*; spouses, *Eubanks v. Eubanks*, 273 N.C. 189, 195, 159 S.E.2d 562, 567 (1968); and officers and board members of condominium associations and condominium unit owners, *Ironman Medical Properties, LLC v. Chodri*, __ N.C. App. __, __, 836 S.E.2d 682, 690 (2019).
[121] *See* N.C.P.I.—Civil 900.10, Definition of Fiduciary; Explanation of Fiduciary Relationship. (6/2020)

Defendants who in equity and good conscience was correspondingly bound to act in good faith and with due regard to the interests of the Plaintiffs as those reposing confidence.[122]

240. The facility held a fiduciary duty toward the sponsor Plaintiffs with regard to the escrow account it purported to establish on their loved ones' behalf in order to hold funds in trust, and with regard to timely and accurately updating and providing timely and accurate information to the sponsor Plaintiffs.[123]

241. Defendants held fiduciary duties with regard to the resident sponsor members, as to the loved ones placed at the Facility by those sponsors.

242. Defendants breached their fiduciary duties based on the facts alleged hereinabove as regards the Plaintiffs.

243. Defendants breached their fiduciary duties by failing to abide by necessary levels of staffing, medications and supplies, by failing to properly staff the facility, provide needed supplies, and provide needed medications, including during periods of time when the family sponsor Plaintiffs were unable to be physically present with their loved ones at the Facility in order to ensure their interests were being respected.

---

[122] "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Green v. Freeman,* 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) (citing *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). "A fiduciary relationship may arise when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.*

[123] "Generally, in North Carolina . . . there are two types of fiduciary relationships: (1) those that arise from legal relations such as … trustee and cestui que trust, [de jure relationships] and (2) those that exist as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other [de facto relationships]." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008).

244.    Defendants further breached their fiduciary duties with regard to holding escrow accounts and other funds and monies and of acting for the residents' benefit and on their behalf with regard to making appropriate and truthful representations to CMS with regard to Medicare and Medicaid funding for the residents.

245.    Defendant's breach of fiduciary duty was a direct and proximate cause of injury and actual damage to the Plaintiffs, for which the Plaintiffs are entitled to recovery of compensatory damages in excess of $75,000.

## COUNT FOUR:  NEGLIGENT INFLICTION OF SEVERE EMOTIONAL DISTRESS

246.    All above-alleged paragraphs are incorporated by reference.

247.    This claim is brought individually by all Plaintiffs.

248.    The Defendants had a duty to act with due care with regard to the Plaintiffs. They breached their duty of care, thereby proximately causing actual injury to the Plaintiffs.  Whereby, the Plaintiffs have suffered damages.[124]

249.     "A standard of conduct established by a safety statute must be followed."[125] "A person's failure to do so is negligence in and of itself."  *Id.*

250.    Here, the Plaintiffs suffered severe emotional distress as a direct and proximate result of the Defendants' violation of standards and laws meant to safeguard the rights of residents under their care and ensure prompt and truthful communications with their family sponsors.

---

[124] *See* N.C.P.I.—Civil 102.84, Negligence—Infliction of Severe Emotional Distress (2/2020).
[125] N.C.P.I.—Civil 102.84.

251. As a result of Defendants' breaches of their duty of due care with regard to the Plaintiffs, the Plaintiffs suffered severe emotional distress. They did not suffer mere temporary fright or anxiety, disappointment or regret.

252. The family sponsor Plaintiffs are entitled to recover for severe emotional distress due to their reasonable concerns for another person, to wit, for each of their resident loved ones at the Citadel. The severe emotional distress they suffered was a reasonably foreseeable result of, and was in fact caused by, the Defendants' negligent, reckless and intentional misconduct.

253. As a direct and proximate result of Defendants' causing of them to suffer from severe emotional distress, the Plaintiffs are each entitled to recover damages in excess of $75,000.

## COUNT FIVE: LIABILITY OF SALISBURY TWO PROPCO LLC ACCORDIUS, PORTOPICCOLO, HYMAN AND ZANZIPER

254. All above-alleged paragraphs are incorporated by reference.

255. Plaintiffs are entitled to a finding that the corporate veil for the LLC Defendants herein should be pierced under the instrumentality rule.[126]

256. During the pertinent times, Hyman and Zanziper engaged in control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transactions attacked herein such that

---

[126] *Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 650, 689 S.E.2d 143, 147 (2009) (citation omitted). (HN6)

the corporate entities as to this transaction had at the time no separate mind, will or existence of its own.

257. During the pertinent times, Hyman and Zanziper used their control to commit a fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or to cause a dishonest and unjust act in contravention of the Plaintiffs' legal rights.

258. During the pertinent times, Hyman and Zanziper's exercise of their control and breach of duty proximately caused the injury or unjust loss complained of, to wit, the understaffing herein.

259. The Court should find that indicia of Hyman and Zanziper's control are evidenced including in light of, on information and belief: (1) inadequate capitalization, a thin incorporation; (2) non-compliance with corporate formalities; (3) complete domination and control of the corporation so that it has no independent identity, and (4) excessive fragmentation of a single enterprise into separate corporations.

260. During the pertinent times, the Defendants conspired and made an agreement to engage in unlawful acts and furthermore engaged in overt acts in furtherance of the conspiracy and to the detriment of the Plaintiffs and class members. Accordingly, the Defendants should be held jointly and severally liable under the doctrine of civil conspiracy.

261. During the pertinent times, the Defendants acted in concert in order to effectuate an unlawful purpose, to wit, implementing a business model by which Defendants would hold out that they would provide excellent staffing and service to the families involved, while in actuality, and pursuant to a business plan known only to

Portopiccolo, Hyman and Zanziper and not to lower-level managers or workers, they had no intention of doing so.

262.    Due to Defendants' conduct giving rise to veil-piercing, their conduct constituting civil conspiracy, their concert of action, and their direct and personal involvement in the material underlying facts, all Defendants should be held jointly and severally liable for all of Counts One to Four hereinabove.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims herein so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully ask this Court to:

A.    Certify this case as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Award the Plaintiffs and the other members of the class their actual damages, in an amount to be determined at trial, for breach of contract;

C.    Award the Plaintiffs and the other members of the class their actual damages, in an amount to be determined at trial, for the unfair and deceptive acts of the Defendants, along with treble damages and an award of attorney fees;

D.    Award Plaintiffs damages for Defendants' breach of fiduciary duty and their infliction of negligent emotional distress;

E.    Award Plaintiffs and the members of the class the costs of suit, including any discretionary costs as may be allowable by law;

F.    Award the Plaintiffs and the other members of the class pre-judgment and post-judgment interest, to the extent allowable by law; and

G.    Award such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted this the 17th day of May, 2021.

s/John Hughes
Mona Lisa Wallace, N.C. State Bar No. 9021
John Hughes, N.C. State Bar No. 22126
Wallace & Graham, P.A.
525 N. Main Street
Salisbury, NC  28144
Phone: 704-633-5244
Fax:  704-633-9434
Email:  mwallace@wallacegraham.com
Jhughes@wallacegraham.com