IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SONYA HOOKER, SYBIL RUMMAGE,      )
DONNA DEAL, KENNETH MICHAEL       )
DEAL, and BETTY DEAL,             )
individually and on behalf of     )
a class of those similarly        )
situated,                         )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )      1:21-cv-00384
                                  )
THE CITADEL SALISBURY LLC,        )
SALISBURY TWO NC PROPCO LLC,      )
ACCORDIUS HEALTH LLC, THE         )
PORTOPICCOLO GROUP, LLC,          )
SIMCHA HYMAN, and NAFTALI         )
ZANZIPER,                         )
                                  )
            Defendants.           )

## <u>MEMORANDUM OPINION AND ORDER</u>

THOMAS D. SCHROEDER, Chief District Judge.

This class action lawsuit, in which Plaintiffs seek damages
arising out of alleged nursing home understaffing prior to and
through the COVID-19 pandemic, returns to the court on Plaintiffs'
motion for class certification pursuant to Federal Rule of Civil
Procedure 23(b)(3) and, alternatively, Rule 23(c)(4).  (Doc. 70.)
Plaintiffs are former residents of The Citadel Salisbury nursing
home: Sybil Rummage, along with her sponsor, Sonya Hooker; and
Betty Deal, along with her sponsors Donna Deal and Kenneth Michael
Deal.  Defendants, The Citadel Salisbury, LLC ("The Citadel");
Salisbury Two NC Propco, LLC; Accordius Health, LLC ("Accordius");

The Portopiccolo Group, LLC ("Portopiccolo"); Simcha Hyman; and Naftali Zanziper, have responded, opposing the motion for class certification. (Doc. 72.) The court held argument on the present motion on November 10, 2022. (Doc. 85.) For the reasons set forth below, the motion for class certification will be denied.

## I. BACKGROUND

According to the amended complaint, Plaintiffs Rummage and Deal ("Resident Plaintiffs") were residents of a nursing home facility located at 710 Julian Road. (Doc. 62 ¶¶ 2, 5, 8-9.)[1] Prior to 2020, when each Plaintiff entered the facility, it was known as "Salisbury Center" and was owned and operated by Genesis Healthcare ("Genesis"). (Id. ¶ 29.) When they arrived at Salisbury Center, Resident Plaintiffs executed admission agreements outlining the care and basic services they should expect to receive. (Id. ¶ 58-59, 130.) Plaintiffs Sonya Hooker, Donna Deal, and Kenneth Michael Deal ("Sponsor Plaintiffs") are family members who sponsor and assist the Resident Plaintiffs. (Id. ¶¶ 4, 6-7.)

On February 1, 2020, Salisbury Center was sold, and operational control was transferred to The Citadel.[2] (Id. ¶ 24.)

---

[1] All citations to the record are to the paragraph number or ECF docket page.

[2] The Salisbury Center residents' contracts were assigned to The Citadel, while new residents after the transfer agreed to new contracts with The Citadel. All contracts had provisions requiring arbitration, but the

2

The services and care at Salisbury Center had deteriorated as Genesis fought financial trouble (id. ¶ 30), and conditions grew worse once The Citadel took over (id. ¶ 35). Residents experienced various problems from alleged chronic understaffing as part of the Defendants' business model, such as failures to provide necessary medication and care to the residents and to adequately communicate with sponsors. (See, e.g., id. ¶¶ 72-74, 118, 120, 141-145.) According to the Centers for Medicare and Medicaid Services ("CMS"), during the time of The Citadel's ownership, the quality rating of the facility declined from one to zero out of five stars. (Id. ¶ 41.) The Citadel was eventually "subject to more frequent inspections, escalating penalties, and potential termination from Medicare and Medicaid" as part of the state's "Special Focus Facility" program for nursing home facilities with a "history of serious quality issues." (Id. ¶ 39.) On May 14, 2022, CMS issued a notice terminating the facility from the Medicare program, requiring it to shut down. (Doc. 85 at 12.) Residents thereafter had to be relocated. (Id.) This led to the closing of the facility in June 2022. (Id. at 4.)

The Citadel was at times relevant a limited liability company organized under North Carolina law with a license with the State of North Carolina, Department of Health and Human Services,

---

parties disagree as to whether any arbitration provision is enforceable. (Doc. 85 at 33-40.)

3

Division of Health Services Regulation, to operate as a for-profit combination skilled nursing facility and adult care home. (Doc. 62 ¶ 9-10.) Defendant Salisbury Two NC Propco, LLC was a limited liability company organized under North Carolina law owning the property where the facility was operated. (Id. ¶ 11.) Defendant Accordius was a limited liability company organized under the laws of the State of New York providing "management" services to The Citadel. (Id. ¶¶ 12-13.) Portopiccolo was a limited liability company organized under New Jersey law providing "back office services" to The Citadel. (Id. ¶¶ 14-15.) The sole members and owners of all limited liability companies involved were Simcha Hyman and Naftali Zanziper. (Id. ¶¶ 16-18.)

Beginning when The Citadel assumed operations, Plaintiffs allege, it was purposefully and consistently staffed inadequately such that it was unable to provide the services required for the safety and well-being of its residents and as promised. (Id. ¶ 56.) Plaintiffs' amended complaint alleges breach of contract against The Citadel,[3] with whom Resident Plaintiffs

---

[3] Plaintiffs' original complaint pursued four causes of action: (1) breach of contract; (2) violations of the North Carolina Unfair and Deceptive Trade Practice Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1; (3) negligent infliction of emotional distress; and (4) breach of fiduciary duty. (Doc. 1 ¶¶ 207-221, 222-234, 246-53, and 235-245.) Plaintiffs later moved to amend the complaint with a proposed amended complaint, which sought to withdraw the claim for breach of fiduciary duty but otherwise maintained claims for breach of contract, violations of the UDTPA, and negligent infliction of emotional distress. (Doc. 36-1 ¶¶ 237-254, 255-269, 270-77.) Defendants moved to dismiss all claims, and later to deny Plaintiffs' motion to amend as futile. (Docs. 24,

4

contracted, and relies on the "instrumentality rule" to allege claims of civil conspiracy and concert of action to pierce the corporate veil to reach the remaining Defendants. (Id. ¶¶ 202-226.) Plaintiffs seek damages for Defendants' failure to "provide the service or supplies and the level of staffing that they were obligated to supply to the resident populations." (Id. ¶ 210.) Plaintiffs also seek to disgorge Medicare or Medicaid payments made on their behalf "reflecting the reasonable value of the staffing hours they were entitled to have received and did not receive." (Id. ¶ 2.) Plaintiffs allege class action treatment, citing "over 100" potential class members and 14 common questions that include the following: the use of "uniform policies and systems" of management; "[w]hether the law requires the facility to maintain staffing at a reasonable across-the-board level," which is alleged to be 4.1 hours per resident day of "total nurse staffing" and 0.75 hours per resident day of "Registered Nurse staffing"; "[w]hether an express or implied-in-fact contract was formed between residents"; and damages. (Id. ¶ 197.)

---

39.) On May 25, 2022, the court dismissed the UDTPA and negligent infliction of emotional distress claims for failing to state a claim under Rule 12(b)(6) but allowed the breach of contract claim to go forward. (See Doc. 61; Hooker v. Citadel Salisbury LLC, No. 1:21-CV-00384, 2022 WL 1663421 (M.D.N.C. May 25, 2022).). Shortly thereafter, Plaintiffs filed the present amended class action complaint, which only alleges breach of contract. (Doc. 62.)

## II. ANALYSIS

### A. Legal Standard

Plaintiffs move to certify a class under Federal Rule of Civil Procedure 23(b)(3), or alternatively as "an issue class under Rule 23(c)(4)."[4]   (Doc. 70.)   Defendants oppose certification, contending that several of the prerequisites to certification have not been met.  (Doc. 72.)

The class action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (internal quotation marks omitted).  Rule 23 "does not set forth a mere pleading standard." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  To be certified, a party seeking class certification must "establish by a preponderance of the evidence that the action complies with each part of Rule 23." Brown v. Nucor Corp., 785 F.3d 895, 931 (4th Cir. 2015) (Agee, J., dissenting) (citing cases).  First, a plaintiff must satisfy the four requirements set out in Rule 23(a): "(1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and

---

[4] Plaintiffs did not move for appointment of class counsel under Federal Rule of Civil Procedure 23(g).  Rule 23(g) requires the court to appoint class counsel at the time the class is certified. See Bell v. Brockett, 922 F.3d 502, 511-12 (4th Cir. 2019) (emphasizing that "[t]his requirement is not optional").  Because the court denies class certification, the appointment of class counsel is moot.

6

(4) adequacy of representation." Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 423 (4th Cir. 2003); see Thorn v. Jefferson-Pilot Life Insurance Co., 445 F.3d 311, 317 (4th Cir. 2006) ("Plaintiffs bear the burden of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden." (internal quotation marks, citation, and alterations omitted)).

Next, the proposed class must show that it is one of the three types of classes described in Rule 23(b). Thorn, 445 F.3d at 318. Here, Plaintiffs seek to certify the class pursuant to Rule 23(b)(3), which provides that a class action may be maintained if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Alternatively, Plaintiffs argue that certification is appropriate under Rule 23(c)(4), which allows courts to certify a class as to certain issues, even when plaintiffs' claims otherwise do not satisfy the predominance test. See Gunnells, 348 F.3d at 439-45. Although it is Plaintiffs' burden to demonstrate compliance with Rule 23, the court "has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) (quoting Wal-Mart, 564 U.S. at 350-

51 (2011)).

At the class certification stage, "[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 568 U.S. 455, 466 (2013); Brown, 785 F.3d at 903 ("[T]he merits of a claim may be considered only when relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." (internal quotation marks omitted)). Otherwise, "[a]n evaluation of the probable outcome on the merits is not properly part of the certification decision." Amgen, 568 U.S. at 467 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2003 amendments); Brown, 785 F.3d at 903 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." (quoting Amgen, 568 U.S. at 466)). Persuasiveness of the class-wide evidence is, in general, a matter for a jury. Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 459 (2016). Of course, if no reasonable juror could believe the class-wide evidence, Plaintiffs would lack common proof. Id. (comparing class certification standards to standards for summary judgment and directed verdict). Additionally, "at the certification stage, the Plaintiff or the Court can refine the classes as necessary to bring them within the requirements of Rule 23, if appropriate." See Abdur-Rahman v. Wells Fargo Bank N.A.,

8

No. 3:21-CV-00207-RJC, 2022 WL 481788, at *6 (W.D.N.C. Feb. 16, 2022) (citing Manuel v. Wells Fargo Bank, National Ass'n, No. 3:14CV238, 2015 WL 4994549 (E.D. Va. Aug. 19, 2015)).

Defendants contest the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy, the Rule 23(b)(3) requirements of predominance and superiority, and alternative certification under Rule 23(c)(4).

### B. Rule 23(a) Requirements

Under Rule 23(a)(2), "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Wal-Mart, 564 U.S. at 349-50 (internal quotation marks omitted). That requires more than a showing that "they have all suffered a violation of the same provision of law." Id. at 350. Instead, it requires that the class members' claims "depend upon a common contention" whose resolution "will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. Thus, a common question, for purposes of Rule 23(a), is one that is likely to "generate common answers" class-wide. Id. (internal quotation marks omitted); see Brown, 785 F.3d at 909 ("*Wal-Mart* instructs that plaintiffs must present a common contention capable of being proven or disproven in 'one stroke' to satisfy Rule 23(a)(2)'s commonality requirement."). This does not necessarily "require that all the questions of law and fact raised by the dispute be common,' just that any 'dissimilarities between the

9

claims do not impede a common resolution.'" <u>Johnson v. Jessup</u>, 381 F. Supp. 3d 619, 634 (M.D.N.C. 2019) (citing 7A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1762 (3d ed. 2018)).  The commonality test is qualitative.  <u>Gunnells</u>, 348 F.3d at 429.  "Quantitatively, almost by definition there will always be more individual . . . issues than common liability issues.  Qualitatively, however, liability issues may far exceed in complexity the more mundane individual . . . issues."  <u>Id.</u> (alternations adopted) (internal quotation marks and citation omitted).  A question is not common "if its resolution turns on a consideration of the individual circumstances of each class member."  <u>Thorn</u>, 445 F.3d at 319 (internal quotation marks omitted).

Plaintiffs argue that commonality is satisfied because "Plaintiffs and the class share a singular, common, general issue: their contractual rights that were violated in an identical manner without regard to any individual determinations regarding individual class members." (Doc. 71 at 8-9.)  Plaintiffs contend that "common issues include: (1) whether named Plaintiffs and the class had a contract with The Citadel; (2) whether Plaintiffs and the class were entitled to a certain minimum level of staffing; and (3) whether The Citadel understaffed the facility thereby

10

breaching its contract." (Id. at 8.)[5]

In response, Defendants argue that Plaintiffs' breach of contract claim "require[s] this Court to make 'individual determinations,' including (i) whether each resident and proposed class member entered into a contract with The Citadel and the specific terms thereof, (ii) whether the contract was breached, and (iii) whether that specific resident was injured by that breach." (Doc. 72 at 9.) Defendants emphasize that, in contrast to the standards cited by Plaintiffs drawn from cases applying unique California law, "North Carolina does not impose upon skilled nursing facilities, like the Citadel, a minimum nursing staffing level[.]" (Id. at 11-12.) Defendants also argue that "even if Plaintiffs could somehow show that The Citadel was 'understaffed' pursuant to various metrics, it does not logically follow that The Citadel's staffing levels ever *actually* failed to meet the residents' needs." (Id. at 12.) Finally, Defendants argue that whether and, if so, how the Emergency or Disaster Treatment Protection Act, N.C. Gen. Stat. §§ 90-21.130 to 90-21.134,

---

[5] Although the amended class action complaint contains a list of 14 proposed common issues, many are permutations on the principal ones identified above and/or otherwise facially fail to meet the commonality standard under Wal-Mart. (Doc. 62 ¶ 197 (e.g., whether Defendants used uniform but inadequate policies for staffing, supplies, and services; whether Defendants caused "systemic understaffing"; whether understaffing "caused harm to facility residents"; whether Defendants "breached contractual duties" to residents; whether "Defendants' breach of contract caused damage to the Plaintiffs"; whether "the class is entitled to an award of compensatory damages"; and whether Plaintiffs are entitled to certification under Rule 23(c)(4)).)

Case 1:21-cv-00384-TDS-JLW   Document 89   Filed 04/20/23   Page 11 of 53

implemented as part of the state's Covid-19 pandemic response, applies to each Plaintiff's claim presents an "individualized determination[] [that] completely dominate[s] the landscape of any alleged class." (Id. at 13-14.)

In reply, Plaintiffs maintain that issues of contract formation are "powerful enough as drivers in the case to warrant at least issue class certification." (Doc. 74 at 3.) Additionally, Plaintiffs argue, "evidence that generally certain [staffing level] metrics are needed to provide adequate staffing to meet resident needs, and [evidence that] Defendant's metrics were far below what was necessary for adequate staffing, could be probative [of breach] in [a potential class member's] breach of contract claim."[6] (Id.) Further, Plaintiffs analogize their

---

[6] Plaintiffs also argue, for the first time in reply, that Defendants "uniform[ly]" breached the "duty of good faith and fair dealing" for each potential class member by failing to "comply with regulations" and uphold the "purpose of the agreement . . . to provide at least minimum" staffing levels. (Doc. 74 at 6.) Specifically, Plaintiffs point to federal regulation 42 C.F.R. § 483. (See id. at 6, n.4.) Local Rule 7.3(h) provides that "[a] reply brief is limited to discussion of matters newly raised in the response." L.R. 7.3(h); see Henry v. N. Carolina Acupuncture Licensing Bd., No. 1:15CV831, 2017 WL 401234, at *4 (M.D.N.C. Jan. 30, 2017). Courts in this district "have consistently held that '[r]eply briefs . . . may not inject new grounds . . . [and that an] argument [that] was not contained in the main brief . . . is not before the Court.'" Tyndall v. Maynor, 288 F.R.D. 103, 108 (M.D.N.C. 2013) (alterations in original)(quoting Triad Int'l Maintenance Corp. v. Aim Aviation, Inc., 473 F. Supp. 2d 666, 670 n.1 (M.D.N.C. 2006)). In sum, Rule 7.3(h) "exists to give the replying party a chance to rebut newly raised arguments, not to give the replying party an unfair advantage in having a chance to make new arguments that should have been raised initially." Pouncey v. Guilford County, No. 1:18CV1022, 2020 WL 1274264, at *5 (M.D.N.C. Mar. 17, 2020). Thus, the court declines to consider this argument.

contract claim to one involving a toxic tort, arguing that answering the "general causation" question whether The Citadel was systematically understaffed "would benefit the entirety of the class and help drive the resolution on the merits." (Id. at 8-9.) In short, Plaintiffs argue that "[w]hen a nursing facility is understaffed, all residents suffer injury on a class-wide basis." (Id. at 7.)

Doubtless, "whether named Plaintiffs and the class had a contract with the Citadel" (Doc. 71 at 8) raises a common issue. But "[a]ny competently crafted class complaint literally raises common 'questions.'" Wal-Mart, 564 U.S. at 349 (citation omitted). As the Supreme Court explained in Wal-Mart, not every "common question" – like whether each plaintiff "suffered a violation of the same provision of law" - is enough. Id. at 349-350. Rather, "[c]ommonality requires the plaintiffs to demonstrate that the class members 'have suffered the same injury.'" Id. (emphasis added) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982)). The class "claims must depend upon a common contention," and that "common contention must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id., at 350.

Judged against this standard, Plaintiffs' principal theory of

13

commonality - that The Citadel was chronically understaffed as a whole based on certain metrics[7] - misses the mark. The central liability question in this breach of contract case is whether Defendants deprived Plaintiffs of the benefit of their bargain. The bargain the parties struck was fundamentally one of money in exchange for skilled nursing care <u>services</u> – not, as Plaintiffs say at one point, "reasonable general staffing metrics." (<u>See</u> Doc. 71 at 13 ("All residents agreed to pay personally and assign their Medicare benefits in return for reasonable general staffing metrics to be met[.]").) Indeed, Plaintiffs themselves appear to recognize this, noting more than once that the parties contracted for services, not predetermined staffing levels. (<u>See</u> Doc. 62 ¶ 213 ("In return for assigning their Medicare, Medicaid, insurance, social security, and personal private funds, to the Defendants, Plaintiffs and class members were <u>contractually entitled to receive services</u> and supplies meeting federal and state skilled nursing standards." (emphasis added)); Doc. 71 at 13 ("The Citadel above all promised to provide <u>service</u>." (emphasis added)); <u>id.</u> at 20 ("The claim is that the residents paid for <u>services they did not receive</u>, in the form of adequate staffing." (emphasis

---

[7] <u>See</u> Doc. 71 at 14 ("Where the Defendants globally set staffing levels and when all facility residents are simultaneously subjected to the understaffed environment, class treatment could not be more appropriate."); <u>id.</u> at 9 ("Defendants . . . only took into account the total census and collective needs of the facility population <u>as a whole</u>." (emphasis added).)

added)); Doc. 74 at 7 ("Every tenant received a nursing home service 'product' that was less than what was agreed to and inferior to the minimum that the operator was obligated to deliver." (emphasis added)).)

The issue of staffing levels at The Citadel is in a general sense common to all class members. But, as noted, Rule 23(a)'s commonality requires that each class member "have suffered the same injury." Wal-Mart, 564 U.S. at 349 (citation omitted); see M.D. ex rel. Stukenberg v. Perry, 675 F.3d 832, 840 (5th Cir. 2012) (explaining that after Wal-Mart "the commonality test is no longer met when the proposed class merely establishes that there is at least one issue whose resolution will affect all or a significant number of the putative class members" (internal quotation marks and citation omitted)). As here, that is to say it is the effect of the staffing level - not the staffing level itself - that is "the essential question on which [plaintiffs'] theory of commonality depends." Wal-Mart, 564 U.S. at 354.[8]

_____

[8] To be sure, whether The Citadel was generally understaffed is in some sense a question "common" to all class members. But "what really matters to class certification" is "not similarity at some unspecified level of generality, but rather, dissimilarity that has the capacity to undercut the prospects for joint resolution of class members' claims through a unified proceeding." Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131 (2009); see also Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir.1998) ("It is not every common question that will suffice [to show commonality], however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation.").

Plaintiffs' amended complaint illustrates the problem, as it alleges that class members are individually impacted in disparate ways as a result of understaffing. (See, e.g., Doc. 62 ¶¶ 91, (failure to do laundry), 104 (poor food), 109 (failure to order a required chair), 111 (development of bedsores), 115 (failure to provide necessary medication), and 172 (failure to prevent spread of COVID-19).) Some of these alleged injuries - such as Covid-19 quarantining failures (id. ¶¶ 89, 172), failure to wear masks, gloves, or other personal protective equipment (id. ¶ 78), poor food quality (id. ¶¶ 104, 119, 171, 187-190), failure to use a computer program for scheduling (id. ¶ 144), lost personal items (id. ¶ 179), and poor-quality undergarments (id. ¶ 164) - are plainly unrelated to the understaffing allegation. While some residents may have suffered these and related problems, other residents may not have suffered these problems, if any. Indeed, Plaintiffs seemingly recognize as much in their motion for class certification: "The FAC [First Amended Complaint] alleges that as a result of the inadequate staffing, the class members did not receive the services that they were promised." (Doc. 71 at 2 (emphasis added).) Thus, as Defendants correctly note, establishing breach of contract, and its extent, would require "individualized determinations" as to each class member, "lead[ing] to a multitude of mini-trials regarding staffing during each shift, each day, and each hall for each potential class

16

member's residency, as well as the care provided." (Doc. 72 at 9-10.) Resolving any individual class member's claim for breach of contract – and hence his or her injury - requires an inherently particularized inquiry into the circumstances of the breach. See Webb v. Exxon Mobil Corp., 856 F.3d 1150, 1156-57 (8th Cir. 2017) (affirming decertification on commonality and predominance grounds in breach of contract case because "establishing breach would require examination of how [defendant's] operation of the pipeline affects the plaintiffs, which . . . varies depending on where individual class members' property is located, as well as many other factors."); Lara v. First Nat'l Ins. Co. of Am., 25 F.4th 1134, 1138 (9th Cir. 2022) ("But to show liability for breach of contract . . . Plaintiffs must also show an injury. And to show an injury will require an individualized determination for each plaintiff."); Spagnola v. Chubb Corp., 264 F.R.D. 76, 98 (S.D.N.Y. 2010) (collecting cases and explaining that "courts have denied certification even in cases that involved form contracts where numerous individual inquiries were required to determine whether a breach of the contract could be found"); cf. August v. Michigan Department of Corrections, 2018 WL 4679597, *4-5 (E.D. Mich. Sept. 29, 2018) (finding commonality lacking in case challenging prison "overcrowding" because even if the prison was overcrowded as a whole, "the varied harms alleged would require individualized fact-finding to analyze each member's Eighth Amendment claim [such

that] [t]he diversity of alleged harms precludes classwide resolution of whether the Defendants' conduct resulted in an extreme deprivation of civilized life's minimal necessities").

Plaintiffs' analogy to the toxic tort context, far from bolstering their case, substantiates this very point. (See Doc. 74 at 8 ("The relation between the common classwide issues, and the individual issues, is like general and specific causation in a tort matter.").) A toxic tort plaintiff "must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure" in order to establish that a specific injury was caused by exposure to a specific substance. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 263 (4th Cir. 1999) (citations omitted). This distinctive causation framework exists because "only rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes." Id. (citation omitted). Conversely, under North Carolina law, the interpretation of the terms of a contract to determine breach is a question of law for the court. Briggs v. American & Efird Mills, Inc., 111 S.E.2d 841, 843 (N.C. 1960). In an agreement for services, the terms must be "certain and definite as to the nature and extent of the service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid, or it will not be enforced." Rider v. Hodges, 804 S.E.2d 242, 246 (N.C. Ct. App. 2017) (quoting Croom v.

18

_Goldsboro Lumber Co._, 108 S.E. 735, 737 (N.C. 1921)).  In order for a breach of contract to be actionable, it must be material, "one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." _Long v. Long_, 588 S.E.2d 1, 4 (N.C. Ct. App. 2003) (citations omitted).  To state the obvious, the liability elements of these types of claims are inapposite.  Unlike causation in toxic torts, there is no general causation in this breach of contract case.

Indeed, in making this analogy, Plaintiffs explain that their claim "is that <u>exposure</u> to Defendants' unlawful low-staffing business model <u>caused</u> Plaintiffs to receive poor, <u>understaffed service</u> and to not receive the benefit of their bargain." (Doc. 74 at 8 (emphasis added).)  This leads to Plaintiffs' concession that "issues of individual causation [and] injury . . . exist." (<u>Id.</u> at 5.)  As this court stated previously, "the understaffing, if demonstrated, would only be evidence to support a claim that any particular Plaintiff failed to receive the services contracted for – that is, that he or she did not receive the proper care and oversight by the nursing and other staff." (Doc. 61 at 24.)

Plaintiffs seek to avoid this result by urging the court to certify a class for a determination whether each class member's contract was breached by Defendants' failure to maintain what Plaintiffs contend is a proper <u>staffing level</u>. (<u>See</u> Doc. 85 at

19

27; Doc. 6-5 at 28-29.)  Plaintiffs rely on the testimony of
Charlene Harrington, R.N., Ph.D., who opines that a facility's
"acuity" level can be established based on the average resident.
(Doc. 6-5 at 31-33.)  According to Dr. Harrington, "[r]esearch
establishes that most skilled nursing facilities generally require
at least 4.1 total nursing hours per resident day ["HPRD"],[9]
including 0.75 registered nursing hours and 1.3 licensed nursing
hours, to provide the necessary nursing services for their
residents." (Id. at 31.)  Because this staffing level is conducted
"at a facility-level," Plaintiffs contend, "it does not require
any individualized inquiry into how many hours of direct nursing
care any specific resident received on any given day." (Id. at
33.)  Rather, Plaintiffs contend, "the proper analysis is whether
the facility as a whole employed an adequate number of qualified
staff to competently care for the collective needs of its
residents." (Id. (emphasis added.)  As Plaintiffs' counsel stated
during oral argument, because Defendants allegedly "strip[ed]" out
assets by not providing the proper level of nursing care,
Plaintiffs should be "entitled to a refund of the moneys that they
assigned - that they either paid directly or that they assigned as
a matter of consideration from Medicare or Medicaid to pay for the
service that they didn't get." (Doc. 85 at 23.)  In this fashion,

---

[9] HPRD simply measures the total number of hours worked divided by the
total number of residents.  See Doc. 6-5 at 40.

Plaintiffs contend, a jury can assess a value on a global basis to all residents. (Id. at 9.) The court should not dwell on individual questions, Plaintiffs contend, because Defendants did not consider "individual needs" but rather "controlled" the process "entirely by a spreadsheet." (Id.)

In making this argument, Plaintiffs rely on a line of cases applying California law. Unlike in California, however, North Carolina does not impose a minimum staffing level on skilled nursing facilities as measured by nursing hours per resident. MacRae v. HCR Manor Care Services, LLC, No. SACV1400715DOCRNBX, 2018 WL 8064088 (C.D. Cal. Dec. 10, 2018), upon which Plaintiffs rely primarily (see Doc. 71 at 7-8), is plainly distinguishable. First, plaintiffs there did not allege breach of contract; rather, they sued under a California statute that provides current or former nursing care patients or residents the right to bring a private cause of action against a skilled nursing facility for violating certain regulations. See Cal. Health & Safety Code § 1430(b). Of a piece with its regulatory character, this statute, at the time McCrae was decided,[10] allowed for a maximum of $500 per lawsuit, regardless of how many discrete violations the skilled nursing facility committed. See McCrae, 2018 WL 8064088; Jarman

---

[10] The statute has since been amended to allow for $500 per regulatory violation. See Cal. Health & Safety Code § 1430(b)(1)(B); Anderson v. Ghaly, No. 15-CV-05120-HSG, 2022 WL 717842, at *3 (N.D. Cal. Mar. 10, 2022).

v. HCR ManorCare, Inc., 471 P.3d 1001, 1004 (Cal. 2020).  Second, the California regulations the nursing facility allegedly violated specifically require each facility to "employ an adequate number of qualified personnel to carry out all of the functions of the facility."  Cal. Health and Safety Code § 1599.1(a) (emphasis added); see MacRae, 2018 WL 8064088 at * 1.  Under this regulation, the district court noted, "facilities are either adequately staffed or not, and an entire facility is not staffed based on individual inquiries into each patient's care needs."  Id. at * 5. Thus, the damages are not related to specific failure sustained by residents, but rather based on a failure to maintain the staffing ratios required by law.[11]

Here, in contrast, North Carolina regulations provide a qualitative standard which requires covered facilities to "have sufficient nursing staff to provide nursing and related services to attain or maintain the physical, mental, and psychosocial well-being of each patient, as determined by patient assessments and individual plans of care." 10A N.C.A.C. 13D.2303(b) (emphasis added).[12]  Similarly, federal regulations require nursing

---

[11] For the same reasons noted above, moreover, Plaintiffs' reliance on Lavender v. Skilled Healthcare Group Incorporated, No. 060264 (Calif. Super. July 6, 2010), is also misplaced.  (See Doc. 74 at 4; Doc. 74-1.)

[12] At oral argument, Plaintiffs conceded that North Carolina law differs from California law in this regard.  (See Doc. 85 at 27.)

facilities to provide "sufficient nursing staff . . . and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number . . . of the facility's resident population[.]"  42 C.F.R. § 483.35; see also 42 U.S.C. § 1396r(b)(4)(C)(i)(l) (requiring skilled nursing facilities to "provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents" (emphasis added)).

Unlike California law, which incorporates a quantitative minimum staffing level of 3.2 nursing hours per patient, North Carolina law imposes no such quantitative minimum staffing level. See Cal. Health & Safety Code § 1276.5(a) ("[T]he minimum number of actual nursing hours per patient required in a skilled nursing facility shall be 3.2 hours[.]")  Plaintiffs cannot now overcome this significant hurdle by stating, based solely on the opinion of a retained expert, that a "reasonable" staffing level of 4.1 HPRD is necessarily incorporated into each and every skilled nursing care contract in North Carolina. (Doc. 71 at 5.)  Such a requirement may be wise policy, but the place to make new legislation lies in Congress and the North Carolina General Assembly, not this court.

Perhaps recognizing the limits of this argument, Plaintiffs

23

advanced a new one for the first time at oral argument.
Specifically, Plaintiffs argued that - putting aside the issue
whether the law requires skilled nursing facilities to maintain
staffing at a certain level based on HPRD - Defendants also
breached their contract with Resident Plaintiffs by failing to
maintain the minimum eight consecutive hours per day of registered
nursing staffing for some 237 days during the relevant period.
(See Doc. 85 at 12-13 (arguing that The Citadel was "out of
compliance" with federal and state regulations requiring a
"registered nurse on duty for eighth consecutive hours every
day").) To be sure, Plaintiffs correctly point out that both state
and federal regulations require skilled nursing facilities to
provide a "registered nurse for at least eight consecutive hours
a day, seven days a week." See 10A N.C.A.C. 13D.2303(d)(2); accord
42 C.F.R. § 483.35(b). And Plaintiffs allege that compliance with
all federal and state regulations governing skilled nursing
facilities are a part of their contracts. (Doc. 62 ¶ 209.) Thus,
any violation of these regulations, Plaintiffs allege, results in
a breach of contract. See Hamilton v. Travelers Indem. Co., 335
S.E.2d 228, 230 (N.C. 1985).

    The problem, however, is that Plaintiffs failed to raise this
theory of liability for breach of contract in any of their
briefing. (See Doc. 71 at 7-11; Doc. 74 at 4-5.) It is
conspicuously absent from the list of 14 common issues alleged in

24

the amended complaint. (Doc. 62 ¶ 197.) And Plaintiffs mention this specific staffing failure only once to show why The Citadel's "average RN HPRD during this period was 0.10 RN hours per resident per day [,]" less than what they contend is the appropriate level of 0.75 HPRD for registered nurse staffing. (See Doc. 71 at 15 ("From March 2020 to October 2021 . . . the facility operated without a registered nurse ("RN") providing direct care to residents for a total of 237 days in the 20-month period. These facts result in an extremely low RN HPRD." (emphasis added)).) In other words, Plaintiffs only invoke this staffing metric in service of their principal argument that less than 4.1 HPRD or 0.75 HPRD (RN) reflects unacceptably low staffing in violation of the express or implied duties of the contracts that Resident Plaintiffs signed. That Plaintiffs' single citation to the relevant North Carolina regulation, 10 N.C.A.C. 13D.2303(d), comes in a footnote of their expert's report, devoid of further explanation, further substantiates this point.[13] (See Doc. 6-5 at 29, n.14.)

---

[13] Plaintiffs do state – albeit in their reply brief – that a common issue is whether "the contract include[s] the duties to comply with state and federal Medicare and other regulations pertaining to resident, service, and safety." (Doc. 74 at 5.) And they also cite, albeit again in a footnote (see id. at 6 n.4), 42 C.F.R. § 483.35, which, as noted, requires skilled nursing facilities to provide "the services of a registered nurse for at least 8 consecutive hours a day, 7 days a week." Id. § 483.35(b)(1). Yet Plaintiffs never put the two together and make any substantive legal argument that the failure to comply with this specific regulation, or its North Carolina equivalent, constitutes a breach of contract. And "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.

25

Because "[r]aising such new arguments for the first time at oral argument undermines the purpose of orderly briefing and risks subjecting an opponent to an unfair disadvantage [,]" N. Carolina All. for Transp. Reform, Inc. v. U.S. Dep't of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010), it is deemed waived and the court need not consider it.[14]  See, e.g., Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 377 (4th Cir. 2012) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue." (internal quotation marks and citation omitted)); Saray Dokum v. Madeni Aksam Sanayi Turizm A.S., No. 17 CIV. 7495 (JPC), 2021 WL 1199470, at *7 (S.D.N.Y. Mar. 30, 2021) (explaining that "[c]ourts are loath to accept . . . belated arguments" made for the first time at oral argument and citing cases); US Airways, Inc. v. Sabre Holdings Corp., No. 11 Civ. 2725 (LGS), 2015 WL 997699, at *3 (S.D.N.Y. Mar. 5, 2015) (concluding that the court need not consider the plaintiff's theory raised for the first time at oral argument because it was both "unwarranted and unfair to [d]efendant, which had no advance notice of [p]laintiff's new argument and no opportunity to brief its opposition"); Keys v. Dart Container Corp.

---

. . . [A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." Schneider v. Kissinger, 412 F.3d 190, 200 (D.C. Cir. 2005).

[14] For the reasons set forth below, however, even certification of this issue under Rule 23(c)(4) would be inappropriate.

of Kentucky, No. 1:08-CV-00138-JHM, 2012 WL 2681461, at *7 (W.D. Ky. July 6, 2012) ("The Court will not consider Plaintiff's argument regarding her retaliation claim raised for the first time at oral argument, and deems that argument waived.").[15]

One other aspect of Plaintiffs' contract claim deserves discussion. The amended complaint alleges:

> Alternatively, Plaintiffs are entitled to damages as measured by the reasonable value of the staffing hours that were not provided but that should have been provided. In return for assigning their Medicare, Medicaid, insurance, social security, and personal private funds, to the Defendants, Plaintiffs and class members were contractually entitled to receive services and supplies meeting federal and state skilled nursing standards. However, they did not. Accordingly, they are entitled to payment of damages representing the difference between the value of the services and supplies they actually received, subtracted from the value of the services and supplies to which they were reasonably entitled under the contract.

(Doc. 62 ¶ 213.) In a generalized sense it can be said that the aggregate staffing level constituted a breach common to every resident of The Citadel. No doubt many, if not all, residents believed they were receiving a properly-staffed skilled nursing facility, and not some lesser level of care such as an assisted living facility. Presumably, the former is more expensive than the latter. On this basis, one could say that each resident

---

[15] Even were the court to consider this limited basis for liability, it would fail to sustain a basis for finding commonality for the same reasons explained; namely, that Plaintiffs "have suffered the same injury." Wal-Mart, 564 U.S. at 349.

suffered a similar injury to the extent of any reduced value of the overall condition of The Citadel facility and its offerings common to each contract price. But even accepting this as so, it is largely unrelated to the central question whether any individual class member failed to receive the benefit of his or her bargain for personal services based on the myriad deficiencies alleged in the amended complaint which will result in individualized questions on a resident-per-resident basis.[16]

*   *   *

For all these reasons, Plaintiffs have failed to carry their burden of demonstrating commonality for their proposed class.[17]

---

[16] Even if the breach claim were so limited, it would also raise the separate question whether any Plaintiff could permissibly split his or her claim for liability for breach in such a fashion, an issue on which the court need not opine.

[17] For similar reasons, it is also doubtful that Plaintiffs have established typicality under Rule 23(a)(3). Typicality differs from commonality, but the two requirements are closely related. See Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Wal-Mart, 564 U.S. at 349 n.5 (quoting Falcon, 457 U.S. at 157 n.13). Plaintiffs allege that their claims are typical "because Plaintiffs and the other class members have been injured by the same wrongful practices[.]" (Doc. 62 ¶ 198.) But as in Deiter, Plaintiffs' claims are only "typical" on an "unacceptably general level." Deiter, 436 F.3d at 467. That is, Resident Plaintiffs Rummage and Deal may have been injured as a result of living in an understaffed facility; but "at a more directly relevant level," their claims will necessarily have "meaningful differences" from the class members they seek to represent. Id.; see also Soutter v. Equifax Info. Servs., LLC, 498 F. App'x 260, 265 (4th Cir. 2012) (unpublished) (finding typicality lacking because determination as to whether the defendant's behavior was

28

Class certification is therefore inappropriate. Because Plaintiffs fail to satisfy the requirement of commonality, the court need not decide whether they also failed any other Rule 23(a) requirement.[18]

## C. Rule 23(b)(3) Requirements

Rule 23(b)(3) class actions are proper where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members,

---

unreasonable under 15 U.S.C. § 1681e(b) with regard to her credit report did not necessarily advance the claim of all the other class members).

[18] Defendants also argue that "the Sponsor Plaintiffs (Sonya Hooker, Donna Deal, and Mike Deal) are inappropriate class representatives, as they lack standing to assert these claims." (Doc. 72 at 16.) Plaintiffs do not respond to this contention, which has merit. In the class action context, "it is essential that named class representatives demonstrate standing through a 'requisite case or controversy between themselves personally and [each defendant][.]'" Cent. Wesleyan Coll. v. W.R. Grace & Co., 6 F.3d 177, 188 (4th Cir. 1993) (quoting Blum v. Yaretsky, 457 U.S. 991, 1001 n.13 (1982)); cf. Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.") To satisfy the "case or controversy" requirement of Article III, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992)). Here, because the alleged contract was between The Citadel and the Resident Plaintiffs (see Doc. 62 ¶ 204 ("The [breach of contract] claim is brought by Plaintiffs Rummage and Deal against the Citadel Salisbury LLC as a contracting party.")), the Sponsor Plaintiffs have not demonstrated that they have suffered an injury-in-fact, see In re Peanut Crop Ins. Litig., 524 F.3d 458, 473 (4th Cir. 2008) ("[I]n order to maintain action for breach of contract, plaintiff must show that alleged breach caused injury." (citing Santana, Inc. v. Levi Strauss & Co., 674 F.2d 269, 275 (4th Cir. 1982))). Accordingly, the court concludes that the "Sponsor Plaintiffs" Sonya Hooker, Donna Deal, and Kenneth Michael Deal do not have standing to pursue relief in this breach of contract action.

29

and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These two requirements relate to the action's "manageability," which is "a practical problem, and primarily a factual one with which a district court generally has a greater familiarity and expertise[.]" See Windham v. American Brands, Inc., 565 F.2d 59, 65 (4th Cir. 1977) (en banc) (citation omitted). Accordingly, trial courts have "a wide range of discretion" in evaluating whether the requirements of Rule 23(b)(3) have been met. Id. (citation omitted); see Reiter v. Sonotone Corp., 442 U.S. 330, 345 (1979) (noting that district courts "have broad power and discretion vested in them" as to the "certification and management of potentially cumbersome" class actions). Factors pertinent to a determination whether the predominance and superiority requirements have been satisfied include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The predominance requirement - that questions common to the class predominate over other individual questions - is more stringent than the "commonality" requirement under Rule 23(a).

30

See <u>Lienhart v. Dryvit Systems, Inc.</u>, 255 F.3d 138, 146 n.4 (4th Cir. 2001). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." <u>Tyson Foods</u>, 577 U.S. at 453 (internal quotation marks omitted). The predominance inquiry begins "with the elements of the underlying cause of action." <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809 (2011). At bottom, the inquiry determines whether a trial meant to resolve class-wide issues is manageable or whether it is likely to devolve into a series of individual mini-trials examining questions specific to individual class members. <u>See</u> <u>Thorn</u>, 445 F.3d at 327–29. While common questions need not be dispositive of the entire class action, Rule 23(b)(3) class certification "should at least provide a definite signal of the beginning of the end" of the litigation. <u>Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.</u>, 254 F.R.D. 68, 74 (E.D.N.C. 2008) (quoting <u>Mertens v. Abbott Labs.</u>, 99 F.R.D. 38, 41 (D.N.H. 1983)).

Plaintiffs argue that the proposed class satisfies Rule 23(b)(3) because "[t]he predominating issue . . . — whether the facility was adequately staffed — is common to all class members and involves a basic promise made to all." (Doc. 71 at 13.)

31

Plaintiffs further contend that "determining whether this agreement was breached on a class-wide basis does not involve any individual questions regarding individual residents when the contractual provisions at issue are the same for all residents." (Id. at 13-14.) In response, Defendants argue that these same commonality arguments fail to satisfy the "more stringent" predominance requirement. (Doc. 72 at 17.) Defendants also rely on Bartels v. Saber Healthcare Group, LLC, No. 5:16-CV-283-BO, 2020 WL 6173566, at *2 (E.D.N.C. Oct. 21, 2020) (denying certification of a putative class action against an allegedly inadequately staffed nursing home), for the assertion that the "well-established law of this Circuit holds that breach of contract claims based on allegations of understaffing at facilities like The Citadel do not satisfy the predominance inquiry." (Doc. 72 at 17.) In reply, Plaintiffs distinguish Bartels as involving a claim where "the assisted living facility operator set a staffing policy of staffing 'no higher' than required staffing level" and as lacking a facility subject to similar staffing regulations. (Doc. 74 at 9-10.)

Here, even if Plaintiffs could satisfy Rule 23(a)'s requirements, it is readily apparent that because of the individualized questions for each resident, common questions for the proposed class do not predominate. Rather than signaling the beginning of the end, to paraphrase Winston Churchill following

Britain's victory in North Africa in 1942, certification would likely signal only the "end of the beginning." W. Churchill, The Lord Mayor's Luncheon, Mansion House, Nov. 10, 1942.

First, as discussed at length above,[19] the question whether The Citadel breached its contract with a particular class member "turns on a consideration of the individual circumstances of each class member" based on the services that member actually received. Thorn, 445 F.3d at 319 (citation omitted); see Bartels, 2020 WL 6173566, at *5 ("Individualized issues will further abound, as plaintiffs must show what the needs of the residents were at any given time in order to show that those needs were [not] met."). Whether The Citadel failed to provide the level of service or care for which a resident contracted is necessarily a specific inquiry for the individual class members. Compare EQT Prod. Co., 764 F.3d at 369 (noting that "with respect to the breach of contract claims, the court will likely need to consider course of performance evidence" and "the need for individualized proof strongly affects

---

[19] "Rule 23(b)(3) most obviously builds on Rule 23(a)(2) as it utilizes commonality itself as the measuring stick for certification but adds an additional measure of commonality." See 1 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 3:27 (6th ed. 2022) ("Newberg on Class Actions"). Accordingly, even assuming Plaintiffs have met their burden under Rule 23(a)(2), for the same reasons discussed above – and others provided herein - they cannot meet the "far more demanding" predominance requirement under Rule 23(b)(3). Amchem, 521 U.S. at 624; see Lienhart, 255 F.3d at 147 n.4 ("In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." (quoting Amchem, 521 U.S. at 609)).

33

the predominance analysis of Rule 23(b)") <u>with</u> <u>Gray v. Hearst</u> <u>Communications, Inc.</u>, 444 F. App'x 698, 702 (4th Cir. 2011) (unpublished) (concluding that certification was warranted for breach of a distribution agreement where the injury was identical for class members and the issue could be resolved in "one stroke").[20]

However, even assuming Plaintiffs are correct that each class member's contract was breached by Defendants' failure to maintain what Plaintiffs contend is a proper staffing level – whether on the theory that staffing less than 4.1 HPRD falls below the "reasonable" level contemplated by the contract, or on the theory (raised late in oral argument) that that the failure to provide eight consecutive hours of skilled nursing care for 237 of the 600 or so days of the relevant period - detailed individualized evidence would still be required to establish each individual class member's other bases of material breach as well as their individual damages.[21]

---

[20] Unpublished opinions of the Fourth Circuit are not precedential but are cited for their persuasive, but not controlling, authority. <u>See</u> <u>Collins v. Pond Creek Mining Co.</u>, 468 F.3d 213, 219 (4th Cir. 2006).

[21] To be sure, the need for individualized damages calculations will not <u>necessarily</u> defeat a finding that common issues predominate, <u>see</u> <u>Gunnells</u>, 348 F.3d at 428-29, but "it is nonetheless a factor that [courts] must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." <u>McLaughlin v. Am.</u> <u>Tobacco Co.</u>, 522 F.3d 215, 231 (2d Cir. 2008), <u>abrogated on other grounds</u> <u>by Bridge v. Phx. Bond & Indem. Co.</u>, 553 U.S. 639 (2008); <u>accord</u> <u>Windham</u>, 565 F.2d at 67-68 (recognizing that "the complexity of, and difficulties connected with, the proof of individual injury and damages" can preclude

34

A contract can be breached in more than one material way. See Long, 588 S.E.2d at 4. Therefore, even if the court were to adopt Plaintiffs' theory of breach, it does not resolve other potential bases for breach alleged in the amended complaint. For example, failure to have 4.1 HPRD of total nursing staffing or 8 consecutive hours of skilled nursing would not necessarily proximately cause all damages Plaintiffs claim. (See, e.g., Doc. 62 ¶ 91, (failure to do laundry), ¶ 104 (poor food), ¶ 109 (failure to order a required chair), ¶ 111 (development of bedsores), and ¶ 172 (failure to prevent spread of COVID-19).) Thus, these alleged failures would be subject to proof of separate breaches. Similarly, if the finder of fact were to reject Plaintiffs' theory of breach, it does not preclude a finding of material breach on other bases on a resident-by-resident basis. Thus, Plaintiffs' theory of breach does not resolve all bases – not even the majority of bases – of potential liability.

It is also hornbook law, in North Carolina and elsewhere, that "the injured party in a breach of contract action is awarded damages which attempt to place the party, insofar as possible, in the position he would have been in had the contract been

_____

class certification under Rule 23(b)(3)); O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 744–45 (5th Cir. 2003) ("Where the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried. In such cases, class certification is inappropriate." (internal quotation marks and citations omitted)).

performed." <u>Strader v. Sunstates Corp.</u>, 500 S.E.2d 752, 757 (N.C. Ct. App. 1998) (citing <u>Perfecting Service Co. v. Product Development & Sales Co.</u>, 131 S.E.2d 9, 21 (N.C. 1963)); <u>see</u> Restatement (Second) of Contracts § 347 (Am. L. Inst. 1981) ("If defective or partial performance is rendered, the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered."); 24 <u>Williston on Contracts</u> § 64:1 (4th ed.) ("[T]he nonbreaching party's general or direct damages are measured by the loss in value of the performance promised by the breacher — that is, the value of what was promised by the breaching party minus the value of the performance actually rendered[.]")

As applied here, the necessary damage calculations (even on Plaintiffs' generalized theories of liability) would thus involve separate evaluations for each of the proposed 100-plus class members.[22] Each proposed class member ostensibly paid a fixed monthly rate to The Citadel in exchange for <u>adequate</u> skilled nursing care, room, and board. (Doc. 62 ¶ 2.) Plaintiffs assert that each resident actually received <u>inadequate</u> care due to inadequate staffing levels. (<u>See</u> Doc. 74 at 8 ("Plaintiffs' claim

---

[22] Plaintiffs concede "that damages could be different for any given resident." (Doc. 85 at 10; <u>see also</u> Doc. 71 at 20 (arguing that so long as liability is established, "all that would remain would be the calculation of each class member's damages"); Doc. 74 at 5 ("[I]ssues of individual . . . injury and damages exist.").)

36

is that exposure to Defendants' unlawful low-staffing business model caused Plaintiffs to receive poor, understaffed service and to not receive the benefit of their bargain.").) The calculation of damages allegedly due each class member would therefore be the difference between the amount paid to The Citadel (e.g., the monthly rate), and the value of the services actually received (e.g., some lesser amount of the monthly rate to reflect the inadequate services). The amount each individual paid to The Citadel is presumably a known figure; but the value of service that each proposed class member actually received would depend on the individual circumstances of each resident. See Restatement (Second) of Contracts § 347 (Am. L. Inst. 1981) (explaining that in instances where "defective" performance is rendered, the loss in value caused by the breach requires a determination of the value of the performance to the injured party himself, which in turn "depend[s] on his own particular circumstances"). Accordingly, demonstrating damages for one class member would have little practical bearing on any damages suffered by another class member. See Wheeler v. United Services Auto. Ass'n, 2013 WL 4525312, *5 (D. Alaska Aug. 27, 2013) (holding that individual issues predominated because "to calculate damages, the Court would be required . . . to conduct a separate evidentiary proceeding for [each] class member"). The varying injuries claimed in the amended complaint - referencing assorted medication dispensing issues

37

(each with differing potential health consequences), failure to properly take patients' temperatures, failure to change clothing, failure to respond to family inquiries, food quality issues, bathing issues, et cetera - bear this out. (See, e.g., Doc. 62 ¶¶ 114, 123-24, 162, 181-84, 187-90.)

As a result, even on Plaintiffs' preferred theory of breach, a class action does not provide a superior method for resolving these claims because individual damage evaluations predominate over common liability issues. See Riffey v. Rauner, 910 F.3d 314, 319 (7th Cir. 2018) (affirming district court's denial of class certification in dispute over refund of union fair-share fees where "the answer to the central question that remains — how much money each individual class member is entitled to recoup — is particularly ill-suited for class treatment, because it depends on a myriad of factors particular to each individual worker"); Ibe v. Jones, 836 F.3d 516, 531 (5th Cir. 2016) ("[I]ndividual damages issues predominated over the common issues of breach because [class members] incurred vastly different expenses, which would essentially necessitate mini-trials to adjudicate damages for each [class member]."); Thomas v. County of Los Angeles, 703 F. Appx. 508, 511 (9th Cir. 2017) (unpublished) (affirming denial of class certification on predominance grounds in prison conditions case because "the damages suffered by individual class members were insufficiently similar to be established through representative

38

testimony"); Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1305 (11th Cir. 2012) (affirming the district court's ruling that "damage-related concerns evidence a predomination of individualized inquiries and render the proposed class unfit for certification"); 1 McLaughlin on Class Actions § 4:19 (19th ed.) ("Courts have routinely denied certification where determining individual damages is not susceptible to a readily-applied, mechanical computation, but rather is dependent on the unique or complex circumstances of each class member.")

Nor have Plaintiffs overcome this hurdle in their proposal of a common method of determining the amount of each proposed class member's actual damages.[23] See Comcast Corp., 569 U.S. at 33 (observing that where damage calculations would otherwise predominate over the common questions, a class may be maintained if the plaintiff demonstrates "that the damages resulting from that injury [are] measurable on a class-wide basis through use of a common methodology." (internal quotation marks omitted)); Windham, 565 F.2d at 68 (noting that individualized claims for damages can be manageable where "the fact of injury and damage breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation" (internal

---

[23] If a class can "demonstrate liability, there must be a method for calculating, and ultimately for distributing, class members' damages." See Newberg on Class Actions § 12:4.

39

quotation marks omitted)). Plaintiffs' cursory discussion of damages is mostly relegated to a brief footnote in which they suggest that "[a] finder of fact could award a Plaintiff the full amount of payments they paid . . . over the class period[,]" or "some amount less than that, reflecting the value of the missing services the Plaintiff should have been provided but was not." (Doc. 71 at 20, n.19; see also id. at 5 ("Plaintiffs seek disgorgement [of] contract payments . . . reflecting the reasonable value of the staffing hours they were entitled to have and did not receive.").) Otherwise, Plaintiffs simply fallback on their argument that individualized damages determinations "does not preclude class certification where common questions of law and fact as to liability clearly predominate." (Doc. 71 at 20 (quoting Haywood v. Barnes, 109 F.R.D. 568, 583 (E.D.N.C. 1986)).) Suffice it to say, Plaintiffs have failed "to demonstrate a method for quantifying individual damages that applies across the board and hence is common to the class[.]" Newberg on Class Actions § 12:4.

Additionally, the individual inquiries necessary for each class member will be further complicated by Defendants' affirmative defenses, such as statutory immunity under North Carolina's Emergency or Disaster Treatment Protection Act, supra, and arbitration for those potential class members who Defendants contend are bound by an arbitration provision incorporated into

40

their contracts.[24]   (See Doc. 72 at 13-15.)   True, individualized

defenses do not necessarily defeat class certification.  See Alig

v. Quicken Loans Inc., 990 F.3d 782, 792-93 (4th Cir. 2021) (noting

that individualized defenses that can be resolved by "ministerial"

exercises do not preclude class certification), vacated and

remanded for other reasons, 142 S. Ct. 748 (2022).  But the Fourth

Circuit has "flatly held that 'when the defendants' affirmative

defenses may depend on facts peculiar to each plaintiff's case,

class certification is erroneous."   Gunnells, 348 F.3d at 438

(alterations omitted)(quoting Broussard, 155 F.3d at 342).

Particularly relevant here is the potential for arbitration

agreements to bar the claims of dozens of potential class members.

When certain members of a class are subject to contracts containing

an arbitration clause, while other class members are not, the

members that are subject to arbitration "are in a different legal

position than those class members who contracts contain no such

provisions."  In re Titanium Dioxide Antitrust Litig., 962 F. Supp.

2d 840, 861 (D. Md. 2013).   When this happens, there is a risk

that beyond the class certification stage "a significant portion

of th[e] litigation would be devoted to discovering which class

---

[24] Defendants estimate that 60 to 70 percent of the potential class
members have contracts with the prior owner with arbitration provisions
that were transferred to The Citadel upon its purchase of the facility
which Defendants would seek to enforce.  (Doc. 85 at 35-37.)  Those who
contracted with The Citadel also would have arbitration provisions,
although Plaintiffs contest their enforceability.  (Id. at 38.)

members signed such agreements and enforcing those agreements, rather than to the resolution of plaintiffs' legal claims." Pablo v. ServiceMaster Glob. Holdings Inc., No. C 08-03894 SI, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) (denying renewed motion for class certification where evidence "currently before the Court" supported an "inference that a significant number" of "putative class members signed arbitration agreements"); Tan v. Grubhub, Inc., No. 15-CV-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016) (collecting cases and noting that a number of courts have "found typicality and adequacy of representation to be lacking where the lead plaintiff was not subject to the same arbitration provisions as unnamed plaintiffs"), aff'd sub nom. Lawson v. Grubhub, Inc., 13 F.4th 908 (9th Cir. 2021); In re Titanium, 962 F. Supp. 2d at 861-62 (finding typicality lacking where "many of the current class members are subject to contractual provisions that expressly foreclose their ability to proceed in this case"); King v. Capital One Bank (USA), N.A., No. 3:11-CV-00068, 2012 WL 5570624, at *14 (W.D. Va. Nov. 15, 2012) (finding that the plaintiff not subject to the arbitration provision "could not fairly and adequately represent in this Court the interests of individuals who are bound to pursue their claims in arbitration"); Renton v. Kaiser Found. Health Plan, No. C00-5370RJB, 2001 WL 1218773, at *5-6 (W.D. Wash. Sept. 24, 2001) (finding plaintiffs failed to meet commonality and typicality requirements in part due

42

to class members' varying contractual provisions requiring arbitration or exhaustion of administrative remedies).[25] Thus, it is evident that, given these individualized questions as applied to the diverse situations of the potential class members, the predominance requirement has not been met.

In the end, Plaintiffs fall back on three cases involving similar claims decided by the Arkansas Supreme Court. See <u>Robinson Nursing & Rehab. Ctr., LLC. v. Phillips</u>, 519 S.W.3d 291 (Ark. 2017), <u>GGNSC Arkadelphia, LLC v. Lamb by & through Williams</u>, 465 S.W.3d 826 (Ark. 2015), and <u>Beverly Enterprises-Arkansas, Inc. v. Thomas</u>, 259 S.W.3d 445 (Ark. 2007). These cases, Plaintiffs say, establish that "[o]ther courts have certified similar actions." (Doc. 71 at 20-21.) However, as Defendants correctly point out, "the[se] three Arkansas state court cases . . . *support* Defendants' position, that this Court should deny Plaintiffs' motion for class certification." (Doc. 72 at 21.) In <u>Beverly</u>, for instance, the court certified a class based on the understaffing of a nursing home pursuant to Rule 23 of the Arkansas Rules of Civil Procedure; but in doing so, the court was careful to note that, contrary to federal precedent interpreting and

---

[25] In many of these cases, courts denied class certification on grounds of typicality and adequacy. But whether couched in terms of typicality and adequacy under Rule 23(a) or predominance under Rule 23(b)(3), the bottom line is that determining which portion of the putative class signed arbitration agreements presents yet another individualized issue that further supports the conclusion that common issues <u>do not</u> predominate over common ones.

applying Rule 23 of the Federal Rules of Civil Procedure, Arkansas precedent did not demand the same "rigorous analysis[.]"  See Beverly, 259 S.W.3d 453 (discussing the difference between federal and Arkansas state law for class certification (citing Tay-Tay, Inc. v. Young, 80 S.W.3d 365, 368 (Ark. 2002)).  Subsequently, the courts in GGNSC and Robinson relied on Beverly and granted similar motions for class certification under Arkansas's Rule 23.  GGNSC, 465 S.W.3d at 831; Robinson, 519 S.W.3d at 296.  Even so, the cases were not without substantial dissenting views that criticized the use of a subjective standard of a proper staffing level to determine breach.  See GGNSC, 465 S.W.3d at 838 (Hart, J., dissenting) (noting a lack of common question law or fact that predominates because "even assuming there is such a cause of action, there is no one set of operative facts to establish liability to any given class member, as the claim of each class member would be an individualized inquiry into whether any particular understaffing was the proximate cause of any injury"); Robinson, 519 S.W.3d at 303-04 (Hart, J., concurring in part and dissenting in part) (noting that "[u]nlike a determination of staffing that is based on specific ratios, this staffing standard is subjective and leaves the court without an objective standard to ascertain, on a classwide basis, whether [the facility] was understaffed," and concluding that "[a] determination of the care needs of the residents and whether any upward adjustment was

44

required would require a highly individualized inquiry as to each resident because each resident clearly had different care needs").

These cases, relying on the Arkansas Rules of Civil Procedure, are therefore readily distinguishable. Here, applying Federal Rule of Civil Procedure 23, the court finds that Plaintiffs have failed to satisfy the predominance and superiority requirements as to their proposed Rule 23(b)(3) subclasses.

**D.    Rule 23(c)(4) Requirements**

Finally, in a single paragraph raised in the alternative, Plaintiffs seek class certification under Rule 23(c)(4) as to the "central" and "fundamentally and qualitatively important issue" of whether the understaffing at The Citadel constituted breach of contract. (Doc. 71 at 22-23 (citing <u>Gunnells</u>, 348 F.3d at 441).) In response, Defendants argue that Plaintiffs fail to "set forth any reason why" this class issue should be certified. (Doc. 72 at 22.)[26] Additionally, Defendants rely on <u>Gunnells</u> to argue that "because Plaintiffs expressly only seek to certify individual issues, their alternative basis for certification under Rule 23(c)(4) must fail." (<u>Id.</u> at 23.) In reply, Plaintiffs proffer several other common issues appropriate for certification, namely:

---

[26] Defendants also argue that "Plaintiffs neglect to set forth the 'central' and 'fundamentally and qualitatively important' issue that it seeks to be certified." (Doc. 72 at 22.) It is clear from their briefing, however, that for Plaintiffs "the central issue affecting both the named Plaintiffs and the class is whether the Defendants' standard business practice of understaffing breached contractual rights." (Doc. 71 at 8.)

"the issue[s] of contract formation, what contract was formed, whether the HPRD [Hours Per Resident Day] standard applies"; and "the exact scope of the duties that the nursing home operator had." (Doc. 74 at 3-4.) They also reiterate that the central issue for certification is "whether Defendant violated its contractual duty to have adequate staffing." (Id. at 4.) Plaintiffs claim that, together, these issues are "sufficiently powerful and predominant as to warrant [their] prosecution under class handling" under Rule 23(c)(4). (Id. at 3-5.)

"When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). A class certified under Rule 23(c)(4) must independently satisfy each of the requirements set out in Rule 23(a) and (b). See Gunnells, 348 F.3d at 441 (noting that the Fourth Circuit "follow[s] the rule . . . that subsection 23(c)(4) should be used to separate 'one or more' claims that are appropriate for class treatment, provided that within that claim or claims (rather than within the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met" (citing In re A.H. Robins, 880 F.2d 709, 728 (4th Cir. 1989), abrogated on other grounds by Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997)). "Given the rule's language, judicial interpretation has coalesced in recent years around a 'broad view' of Rule 23(c)(4) in which common questions

need predominate over individual ones only for the specific issues that are certified, not for the entire cause of action." In re Marriott International, Inc., Customer Data Security Breach Litigation, 341 F.R.D. 128, 168 (D. Md. 2022) (citing Newberg on Class Actions § 4:91 (5th ed. 2021)); see Parker v. Asbestos Processing, LLC, No. 0:11-CV-01800-JFA, 2015 WL 127930, at *11 (D.S.C. Jan. 8, 2015) (interpreting Gunnells to allow Rule 23(c)(4) certification "of a class as to an issue regardless of whether the claim as a whole satisfies the predominance test in Rule 23(b)(3)").[27]  The Fourth Circuit "has admonished district courts to 'take full advantage of the provision in [Rule 23(c)(4)] permitting class treatment of separate issues' in order 'to promote the use of the class device and to reduce the range of disputed issues' in complex litigation." Central Wesleyan College v. W.R. Grace & Co., 6 F.3d 177, 185 (4th Cir. 1993) (quoting In re A.H. Robins, 880 F.2d at 740); see In re Marriott, 341 F.R.D. at 168 (D. Md. 2022) (adopting the "broad view" as to Rule 23(c)(4)). The language of Rule 23(c)(4), however, speaks of certifying particular issues "when appropriate," and thus "[c]ourts should use Rule 23(c)(4) only where resolution of the particular common

---

[27] For this reason, Defendants are incorrect that Gunnells stands for the proposition that a district court may only "certify individual causes of action, not individual issues, for class treatment." (Doc. 72 at 23 (quoting Farrar & Farrar Dairy Inc., v. Miller-St. Nazianz, Inc., 254 F.R.D. 68, 77 (E.D.N.C. 2008)).). See In re Marriott Int'l, 341 F.R.D. at 168, n. 60.

47

issues would materially advance the disposition of the litigation as a whole." Jacob v. Duane Reade, Inc., 293 F.R.D. 578, 589 (S.D.N.Y. 2013) (internal quotation marks omitted).

Here, the court declines to certify a class under Rule 23(c)(4). First, as discussed extensively above, even if the court certified the issue whether The Citadel was understaffed pursuant to the HPRD metric, this would only provide evidence as to one basis (of many) for a claim of material breach, and it would not resolve whether individual Plaintiffs received the qualitative care for which they contracted. (See Doc. 61 at 24 ("[T]he understaffing, if demonstrated, would only be evidence to support a claim that any particular Plaintiff failed to receive the services contracted for – that is, that he or she did not receive the proper care and oversight by the nursing and other staff.").) Plaintiffs appear to recognize as much in their reply brief, acknowledging that it is really the "issues of contract formation, what contract was formed, [and] whether HPRD standard applies" – and not "the elements of breach and the breach causing damage[]" – that are "powerful enough as drivers in the case warrant at least issue class certification." (Doc. 74 at 3.) But certification of these threshold issues would do little to advance the litigation as a whole, given the overriding issue of Defendants' liability for breach of contract – with all its concomitant individualized evidence - would still remain to be resolved. Accordingly, class

certification under Rule 23(c)(4) on these issues – contract formation, and the "exact scope of the duties that the nursing home operator had" - is inappropriate. See Tillman v. Highland Industries, Inc., No. 4:19-CV-02563-SAL, 2021 WL 4483035, at *19 (D.S.C. Sept. 30, 2021) (denying Rule 23(c)(4) certification because "the fact remains that Defendant's liability as to the three causes of action will not be determined as a result of the trial on the certified issues" (emphasis added) (citing Parker, 2015 WL 127930, at *14)); In re St. Jude Medical, Inc., 522 F.3d 836, 841 (8th Cir. 2008) ("Even courts that have approved 'issue certification' have declined to [exercise it] where the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation."); McLaughlin v. American Tobacco Co., 522 F.3d 215, 234 (2d Cir. 2008) (concluding that, "given the number of questions that would remain for individual adjudication, issue certification would not reduce the range of issues in dispute and promote judicial economy" (internal quotation marks omitted)), abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639 (2008).

Finally, even if Plaintiffs were correct that liability for breach of contract could be established solely by reference to staffing levels at the facility (or even by reference to The Citadel's failure to provide eight consecutive hours of care by a

49

registered nurse for some period of the relevant time), the court finds that certification of this issue is still not appropriate. "When considering superiority in the context of Rule 23(c)(4) . . . courts should consider whether the efficiency gains of certification outweigh the fact that individualized issues requiring significant time and attention remain for later." In re Marriott Int'l, 341 F.R.D. at 170 (alterations, internal quotation marks, and citation omitted). Here, it is not at all clear that certification of the liability class that Plaintiffs propose will be significantly more efficient than resolving each case individually. While Plaintiffs wish to proceed with a theory of damages based on aggregate "acuity" level, or alternatively the failure to provide the 8 consecutive hours a day of skilled nursing required by state law, this does not prevent the Defendants from putting on evidence of the effect of this on a resident-by-resident basis. Thus, even if one resident suffered from inadequate staffing on one day or in one month, another resident may not have suffered, or may have suffered only nominally. Whether the failure to provide the staffing was material to each of the more than 100 residents may depend on the effect on each resident.

Moreover, before making any determination of breach, the court would still be faced with questions whether each resident is bound by an arbitration clause in his or her contract. Should class members survive that determination, the court would have to

50

determine for each whether he or she would be entitled to relief in light of the North Carolina Emergency or Disaster Treatment Protection Act, N.C. Gen. Stat. §§ 90-21.130 to 90-21.134. And if this defense were no bar to recovery, individual trials would still be required on the ultimate issue of damages. This, in turn, would require a determination of the "value" that any individual Plaintiff lost because of the breach; a determination which, as noted above, would require extensive individualized evidence from both the individual resident and the Defendants regarding "the value of the missing services the Plaintiff should have been provided but was not." (Doc. 71 at 20 n.19.) Apart from the obvious fact that Medicare and Medicaid allegedly made payments for some portion of the class, Plaintiffs have made no showing that class members lack an incentive to prosecute their own claims.[28] Indeed, "there is a substantial amount of money potentially at stake for each class member (many thousands of dollars)[.]"[29] Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc., 308 F.R.D. 630, 640 (N.D. Cal. 2015) (concluding that issue

---

[28] Plaintiffs' counsel acknowledged the practical effect this has on the litigation and noted that the federal government's lien on all such payments would have to be negotiated. (Doc. 85 at 13-14.)

[29] Plaintiffs note that "contracts in the record reflect daily room rates of $345 for a semi-private room per day and $359/day for private room." (Doc. 74 at 11.) Accordingly, any resident who stayed at The Citadel throughout the entire twenty-month period paid roughly $207,000 total. Even if only a fraction of this was recoverable, any individual Plaintiff's claim could potentially be thousands of dollars.

certification was inappropriate because it would not "substantially or materially" advance the litigation); <u>Matter of Rhone-Poulenc Rorer, Inc.</u>, 51 F.3d 1293, 1299 (7th Cir. 1995) (observing that the potential amount of recovery in individual cases can cut against class certification).[30]

At bottom, the party seeking certification of an issue class under Rule 23(c)(4) has the burden of demonstrating why the issue class is "appropriate" – that is, "how litigating certain issues on a class-wide basis rather than individually will move the litigation forward in a significant and efficient manner." <u>Valenzuela v. Union Pac. R.R. Co.</u>, No. CV-15-01092-PHX-DGC, 2017 WL 1398593, at *7 (D. Ariz. Apr. 19, 2017). Because Plaintiffs have not done so, certification of an issue class under Rule 23(c)(4) will be denied.

_____

[30] Plaintiffs are not without alternative means to pursue their claims. For example, they can seek to pursue bellwether trials. Apart from possible collateral estoppel effects, a decision on the merits in any individual case would at least be persuasive authority going forward. Plaintiffs can also use discovery devices, such as requests for admission pursuant to Federal Rule of Civil Procedure 36, to request that Defendants admit to the accuracy of certain factual statements to simplify and expedite individual trials. <u>See</u> <u>Parker v. Asbestos Processing, LLC</u>, No. 0:11-CV-01800-JFA, 2015 WL 127930, at *14 (D.S.C. Jan. 8, 2015); <u>In re Marriott</u>, 341 F.R.D. 128, 170 (D. Md. 2022) (recognizing that use of other procedural devices, including Federal Rule of Civil Procedure 36, could be an alternative to issue certification). Use of this procedural device may be especially workable where, as here, Plaintiffs appear to have relied almost entirely on Defendants' own records in marshalling their factual case. (<u>See, e.g.</u>, Doc. 71 at 16-17.) Such a device has the added enforcement benefit of an award of reasonable expenses, including attorneys' fees, incurred in making proof for a denial. Fed. R. Civ. P. 37(c)(2).

## III. CONCLUSION

Plaintiffs present a sympathetic case that elderly residents of a skilled nursing facility were subjected to deficient service, contrary to that for which they allegedly contracted. Whatever difficulties The Citadel experienced, moreover, may well have been exacerbated during the Covid-19 pandemic, which inflicted a particularly severe toll on congregate managed care facilities. However, for the reasons set out above, Plaintiffs' uniquely-tailored claim for damages for breach of contract based on aggregate staffing hours is not readily amenable to class relief.

IT IS THEREFORE ORDERED that Plaintiffs' motion for class certification (Doc. 70) is DENIED.

                              /s/   Thomas D. Schroeder
                              United States District Judge

April 20, 2023